**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROBERT J. FOX,

*Plaintiff-Appellee,*

v.

GENERAL MOTORS CORPORATION,

*Defendant-Appellant,*

and

ROBERT TRUMBLE, Bankruptcy
Trustee,

*Trustee.*

No. 00-1589

Appeal from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
W. Craig Broadwater, District Judge.
(CA-97-14-3)

Argued: March 1, 2001

Decided: April 13, 2001

Before WILKINS, MOTZ, and TRAXLER, Circuit Judges.

Affirmed in part and reversed in part by published opinion. Judge
Motz wrote the opinion, in which Judge Wilkins and Judge Traxler
joined.

## COUNSEL

**ARGUED:** Susan Renee Snowden, MARTIN & SEIBERT, L.C.,
Martinsburg, West Virginia, for Appellant. Terry Lane Armentrout,

ARMENTROUT & ARMENTROUT, P.L.C., Harrisonburg, Virginia, for Appellee. **ON BRIEF:** Ronald S. Rossi, Michele L. Dearing, MARTIN & SEIBERT, L.C., Martinsburg, West Virginia, for Appellant.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

This case requires us to resolve an issue of first impression in the appellate courts: is a hostile work environment claim cognizable under the Americans with Disabilities Act? We conclude that it is, and that the plaintiff here presented sufficient evidence to establish such a claim. Accordingly, we affirm the jury verdict for the plaintiff, but vacate, as without basis, a portion of the damages awarded to him.

### I.

Robert Fox began working for General Motors in Wilmington, Delaware in 1968. Shortly thereafter, Fox moved to GM's newly-opened Martinsburg, West Virginia plant. For the next twelve years, from 1968 until 1980, Fox worked at the Martinsburg plant as a tool handler, stock attendant, and finally truck driver.

In 1980, Fox suffered a non-work related injury to his back and became unable to work. Fox remained employed at GM, but was on disability leave until September 1991, at which time Fox returned to the plant to work in the unitizing department. In August 1992, Fox re-injured his back and was forced to take disability leave again. He was able to return to work, with light duty restrictions in October 1992. In November 1993, Fox aggravated his back again and took disability leave, this time for nearly a year. Fox returned to work in the unitizing department in October 1994 and remained there until August 1995, when he again went on disability leave. It is the period of employment preceding this leave — from October 1994 until August 1995 — that is at issue in this case.[1] When Fox returned to work in

---

[1]Fox returned to work at the Martinsburg GM plant in May 1998 and, supervised by different personnel, has continued to work there since that time.

October 1994, his doctor restricted him to light-duty work. Fox testified that because of his disability his supervisors and co-workers subjected him to a barrage of harassment and his supervisors often ordered him to perform jobs beyond his physical abilities.

Specifically, Fox testified that when his immediate supervisor, Jim Pearrell, attempted to accommodate Fox's restrictions, some of Fox's co-workers resented this accommodation; they complained to another supervisor, Tom Dame, and the general foreman, Bill Okal. Dame and Okal then sought to prevent Pearrell from accommodating Fox; they took pictures of the tasks that Fox performed and asserted that those tasks were no different, in terms of the effect on Fox's back, than the tasks Fox refused to perform because of his disability. Okal then insisted that Pearrell require Fox to perform the tasks that Fox maintained aggravated his back.

In December 1994, Dame directly supervised Fox for a period of two days. On the second day, Dame approached Fox, who was working at the light-duty table, and, in a loud voice, using profane language, asked Fox to perform a task that was beyond his physical ability. When Fox responded that he could not perform the requested task, Dame asked "Why the F--- can't you do it?" Fox explained that his abilities were medically limited because of his back. Dame then stated "I don't need any of you handicapped M-----F-----'s. As far as I am concerned you can go the H--- home."[2]

On another occasion, when a supervisor again assigned Fox a specific task that would likely hurt his back, he requested a meeting with Pearrell, Okal, several management officials, and his union representative. At the meeting, Okal began by telling Fox that he knew how Fox felt because he too had back problems. Fox responded, "Mr. Okal, you do not know how I feel. My back don't speak to yours . . . . I have back problems and I can't go by your feelings." Okal became upset and then told Fox that he would like to know "[h]ow in the F---- do you take a S-H-I-T with these restrictions?" At this point, some of

---

[2]At trial, Fox and many of the other witnesses were reluctant to repeat some of the language that their supervisors had used and so instead they just said the first letter of, or spelled out, the word in question.

the other officials at the meeting began making fun of the disabled workers.

After that meeting, Fox continued to be able to perform, and did perform, numerous jobs in the unitizing department, but Okal nonetheless "kept putting [Fox] in jobs [he] couldn't do." Fox then consulted his neurologist, Dr. Liberman, who issued new medical restrictions for Fox, under which Fox was limited to working at the light-duty table. Prior to that time, workers with medical restrictions performed light-duty tasks at a large group table, but after Dr. Liberman restricted Fox to tasks at the light-duty table, Okal assigned Fox to a small individual table and chair directly in front of his office. Not only were the table and chair located in a hazardous area, but they were also too low for Fox, who testified that he was six feet seven inches tall. As a result, he re-aggravated his back injury.

Because of Okal's harassment, Fox decided to apply for a truck driver position, which met his medical restrictions and for which he was otherwise qualified. Okal, however, refused to allow Fox to take the physical examination that was a prerequisite for obtaining the truck driver position.

In addition to these incidents, Fox testified to constant verbal harassment and insults directed at him and other disabled workers; indeed, Fox testified that "it was brought up all the time." For example, at safety meetings, held each week, Okal referred to the disabled workers as "handicapped people" and "hospital people." Okal and Dame also frequently called Fox and other disabled workers "handicapped MFs" and "911 hospital people." Fox also testified that Okal instructed the other employees not to talk to the disabled employees. Perhaps because of this, Fox's co-workers ostracized the disabled employees and refused to bring needed materials to the light-duty table where they worked. Fox also testified that Okal refused to permit disabled employees to work overtime.

Several other employees at the GM plant similarly testified that they themselves had been harassed because of their disabilities or had witnessed harassment of Fox and other disabled workers. Andrew Young explained that he heard Okal and Dame make disparaging comments about the disabled employees at the light-duty table, call-

ing them "hospital people." Vince Largent recalled that both Dame and Okal directed profanity and insults at the disabled workers and that Okal instructed the other employees not to talk to the disabled workers at the light-duty table. Lewis Washington testified that Dame and Okal used profanity and insulted the employees who had medical restrictions and that other workers treated those employees "like they had a disease." Finally, John Green recalled that Okal supervised the disabled workers at the light-duty table more closely than other employees and segregated them from other employees.

Fox testified that the harassment he experienced at GM caused him both physical and emotional injury. Additionally, Fox offered testimony from his psychiatrist, Dr. Soule, and his neurologist, Dr. Liberman.

Dr. Soule, who had been treating Fox since January 1994 for depression caused by his back pain, his divorce, and the death of his daughter, testified that in April 1995 Fox came to him complaining of harassment at work.[3] Fox told the psychiatrist that he was being "openly joked about" because of his disability, and was being asked to perform tasks that aggravated his back injury. Fox reported that he "fe[lt] ready to explode." For these reasons, Dr. Soule ordered that Fox be placed on medical leave from work for a few weeks in the Spring.

Dr. Liberman testified that Fox came to him in July 1995, complaining that he was being forced to work at a chair and table that hurt his back, and that he was being harassed at work and "deliberately given things to do" that aggravated his back injury. On August 14, 1995, Fox returned to Dr. Liberman complaining of worsening back pain, anxiety, and severe depression, including some suicidal thoughts. Dr. Liberman concluded that, although Fox was physically capable of performing light-duty work, the constant harassment precluded Fox from continuing to work at the GM plant. Dr. Liberman explained that the harassment caused depression and anxiety, which in turn led to a worsening of Fox's physical condition. At that time,

---

[3]Dr. Soule was unavailable at the time of the second trial, so his testimony from the first trial was read into the record.

then, Dr. Liberman recommended that Fox be placed on disability leave.

Fox went on disability leave as recommended by Dr. Liberman in August 1995 and remained on leave until May 1998. Fox sought workers' compensation benefits from the state of West Virginia for that period of leave. Although his request was initially denied, he eventually received temporary total disability benefits for the period August 15, 1995 through October 11, 1997. Dr. Liberman completed Fox's workers' compensation forms. On those forms, he indicated that Fox was totally disabled and could not do any work. In 1997, Fox initiated this action against GM. Fox alleged that, after his return to work in October 1994, GM discriminated against him and subjected him to a hostile work environment in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (1994). After the first trial resulted in a hung jury, the case was retried and the jury returned a verdict for Fox on his hostile environment claim, but found for GM on Fox's claim of discriminatory treatment. The jury awarded Fox $200,000 in compensatory damages, $3,000 for medical expenses, and $4,000 for lost overtime. The district court denied GM's post-trial motions for judgment notwithstanding the verdict, to alter or amend the judgment, and for a new trial. GM now appeals on several grounds.

## II.

Initially (and somewhat summarily), GM contends that a claim for hostile work environment is not actionable under the ADA. The company maintains that this is so because the Supreme Court and the federal appellate courts have not yet expressly upheld such a claim. However, GM has not cited and we have not found any case holding that the ADA does not allow such a claim. *Accord Walton v. Mental Health Ass'n*, 168 F.3d 661, 666-67 n.2 (3d Cir. 1999) ("[W]e have not discovered any case holding that [a hostile environment] claim cannot be asserted under the ADA."). Moreover, GM points to no statutory language that would assertedly foreclose such a claim.

In fact, the ADA mandates that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the

hiring, advancement, or discharge of employees, employee compensation, job training, and *other terms, conditions, and privileges of employment.*" 42 U.S.C. § 12112(a) (emphasis added). The Supreme Court has expressly held that very similar language creates a cause of action for hostile work environment under Title VII. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Patterson v. McLean Credit Union*, 491 U.S. 164, 180 (1989); *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64-66 (1986).

Title VII provides in pertinent part: "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, *terms, conditions, or privileges of employment* . . . ." 42 U.S.C. § 2000e-2(a) (1994) (emphasis added). In *Patterson*, the Court explained that, "harassment in the course of employment is actionable under Title VII's prohibition against discrimination in the terms, conditions, or privileges of employment." *Patterson*, 491 U.S. at 180 (internal quotation marks omitted).

Congress enacted the ADA *after* the Supreme Court's holding in *Patterson*. Thus, we can presume that Congress was aware of the Court's interpretation of "terms, conditions, or privileges of employment" when it chose to use parallel language in the ADA. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979) (holding that it is appropriate to assume that Congress is aware of the federal courts' interpretation of statutory language and that use of similar language in a subsequent statute reflects an intent to have that statute interpreted similarly). Here, this presumption appears particularly valid. For in the ADA itself Congress evidenced its knowledge of, and reliance on, the parallel nature of the two statutes, providing that "the powers, remedies, and procedures set forth in [Title VII] shall be the powers, remedies, and procedures [the ADA] provides." 42 U.S.C. § 12117(a).

Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose — the prohibition of illegal discrimination in employment — courts have routinely used Title VII precedent in ADA cases. *See Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996) ("[I]n analyzing claims under the ADA, it is appropriate to borrow from our approach

to the respective analog under Title VII."); *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157 (3d Cir. 1995) ("[I]t follows that the methods and manner of proof under one statute should inform the standards under the other[ ] as well."). *See also Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999) (holding that Title VII causation standards apply in ADA cases); *Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995) (holding Title VII burden shifting rules apply in ADA cases).

For these reasons, we have little difficulty in concluding that the ADA, like Title VII, creates a cause of action for hostile work environment harassment. *Cf. Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996) (concluding that a hostile work environment claim is actionable under the ADEA because of the use of the "terms, conditions, or privileges of employment" language and "the general similarity of purpose shared by Title VII and the ADEA"). This view appears to be sanctioned by the EEOC, whose regulations implementing the ADA state that "[i]t is unlawful to coerce, intimidate, threaten, *harass* or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by" the employment provisions of the ADA. 29 C.F.R. § 1630.12(b) (emphasis added). We further note that several of our sister circuits have assumed that the ADA includes a cause of action for hostile environment harassment modeled after the Title VII cause of action. *See Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir. 1999) (proceeding on the assumption that a hostile environment claim is cognizable under the ADA); *Walton*, 168 F.3d at 666-67 (assuming without deciding that cause of action exists); *Wallin v. Minn. Dep't. of Corr.*, 153 F.3d 681, 688 (8th Cir. 1998) (same); *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998) (same). In addition, many district courts faced with resolving the question have recognized the existence of an ADA hostile environment claim. *See, e.g.*, *Gray v. Ameritech Corp.*, 937 F. Supp. 762, 771 (N.D. Ill. 1996); *Henry v. Guest Servs., Inc.*, 902 F. Supp. 245, 251-52 & n.9 (D.D.C. 1995); *Mannell v. Am. Tobacco Co.*, 871 F. Supp. 854, 860 (E.D. Va. 1994). Today, we too, expressly so hold.

III.

GM maintains that even if the ADA does create a cause of action based on a hostile work environment, we must reverse the jury verdict

because Fox did not offer evidence sufficient to prove such a claim. Appropriately modifying the parallel Title VII methodology, an ADA plaintiff must prove the following to establish a hostile work environment claim: (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer. *See Brown v. Perry*, 184 F.3d 388, 393 (4th Cir. 1999) (stating elements of a sexual harassment hostile work environment claim). GM maintains that Fox has failed to satisfy the first and fourth elements because he did not prove that he was a qualified individual with a disability or that he suffered severe or pervasive harassment. We consider each contention in turn.

A.

The ADA prohibits discrimination only against a "qualified individual with a disability," 42 U.S.C. § 12112(a), and defines such a person as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions" of his job. 42 U.S.C. § 12111(8). GM contends that because Fox claimed total temporary disability when applying for workers' compensation benefits for the period after August 15, 1995, he could not have been able, even with accommodation, to perform the essential functions of his job at GM for the period prior to August 15, 1995 at issue in his ADA claim.

The mere act of applying for disability benefits does not estop a plaintiff from making a subsequent ADA claim. *See EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 378 (4th Cir. 2000). In an analogous case, in which the plaintiff in an ADA action had applied for, and received, Social Security Disability Insurance (SSDI), the Supreme Court recently held that "despite the appearance of conflict that arises from the language of the two statutes, the two claims do not inherently conflict to the point where courts should" presume that "the claimant or recipient of . . . benefits is judicially estopped from asserting that he is a qualified individual with a disability." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 800-02 (1999) (internal quotation marks omitted). This is so because the two statutes "pursue dif-

ferent statutory purposes and require different, though related, inquiries into an individual's disability." *Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 790 (7th Cir. 1999). For example, the ADA considers a plaintiff to be a qualified individual with a disability if he is able to perform the job in question with reasonable accommodation, whereas other statutes, like the Social Security Act, do not consider the possibility of reasonable accommodation when determining whether a claimant is disabled. *See Cleveland*, 526 U.S. at 803.

However, because of the possibility of inconsistency, to avoid summary judgment, an ADA plaintiff who is shown to have claimed total disability in the context of another statutory scheme "is required to proffer a sufficient explanation for any apparent contradiction between the two claims." *Stowe-Pharr*, 216 F.3d at 378. "[T]hat explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Cleveland*, 526 U.S. at 807 (internal quotation marks omitted).

In this case, Fox has offered two explanations as to why he was both totally disabled, and so entitled to workers' compensation benefits, and a qualified individual with a disability entitled to bring a claim under the ADA. Each reason satisfactorily reconciles any apparent contradiction between the two claims.

First, as Fox notes, his two claims do not overlap temporally. Fox's ADA claim concerns the period from October 1994 to mid-August 1995. Fox sought workers' compensation from the state of West Virginia for the period of disability leave beginning in mid-August 1995 after he left the plant. Thus, application for and receipt of workers' compensation benefits for total temporary disability for the period *after* mid-August 1995 does not preclude the damages Fox seeks under the ADA for the harassment that he experienced *prior* to mid-August 1995.

Furthermore, as Fox also points out, he produced evidence that he could have, and would have, continued to work (with reasonable accommodation) at the GM plant in August 1995 but for the hostile work environment to which he was subjected at the plant. Fox so tes-

tified and his treating physician, Dr. Liberman, corroborated this explanation. Dr. Liberman explained that had Fox's supervisors not required him to perform tasks that aggravated his back and not subjected him to constant harassment — which increased his anxiety level, thereby aggravating his back injury — Fox could have continued to work at the GM plant in August 1995. However, Dr. Liberman concluded that the harassment rendered Fox unable to work even with accommodation. In other words, when Fox returned to work in October 1994, he was able to perform the essential functions of his job, with reasonable accommodation for his disability, and he would have continued to be able to do so had he not been harassed on the job. This harassment caused total, albeit temporary, disability.

In sum, Fox has proffered a "sufficient explanation for any apparent contradiction" between his ADA and workers' compensation claims. *Stowe-Pharr*, 216 F.3d at 378.

B.

Even so, GM contends that we must reverse the jury verdict because Fox assertedly failed to demonstrate that the harassment he experienced was sufficiently severe or pervasive to create a hostile work environment.

To recover on a hostile environment claim, a plaintiff must demonstrate not only that he subjectively perceived his workplace environment as hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively hostile. *See Silk*, 194 F.3d at 804. Although GM makes no claim as to Fox's subjective beliefs, the company does contend that, in this case, no reasonable person could find the workplace hostile. Factors to be considered with respect to the objective component include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Walton*, 168 F.3d at 667 (quoting *Harris*, 510 U.S. at 23). The district court instructed the jury as to the elements of a hostile work environment claim, including the "severe or pervasive" element, and the jury concluded that Fox had been subjected to a hostile work environment at the Martinsburg plant. We will not disturb a jury finding unless, drawing all reason-

able inferences in favor of the plaintiff, there was "no legally sufficient evidentiary basis for a reasonable jury" to so find. Fed. R. Civ. P. 50(a)(1); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-50 (2000).

Review of the record reveals that Fox offered a good deal of evidence that supervisors Okal and Dame, in vulgar and profane language, constantly berated and harassed him and the other disabled workers; indeed, Fox presented evidence that such harassment occurred at least weekly. He also proffered evidence that Okal and Dame encouraged other employees to ostracize the disabled workers and prevent them from doing their assigned tasks by refusing to give them necessary materials. Moreover, according to Fox's testimony, his supervisors' harassment exposed him to some physical harm, i.e., aggravation of his back injury when they required him to perform tasks that were too physically demanding and to sit at a too-small work table in a hazardous area. A fact finder could conclude from this evidence that the harassment Fox experienced was frequent, severe, physically harmful, and interfered with his ability to perform his job. In other words, Fox presented evidence of a workplace environment that a reasonable person could easily find hostile. Consequently, we cannot hold that there was "no legally sufficient evidentiary basis" for the jury to find for Fox on his hostile work environment claim.

Nor are the cases on which GM relies to the contrary. In many of those cases, the court rejected the plaintiff's claim because the plaintiff failed to demonstrate that the harassment was sufficiently related to the plaintiff's disability. *See, e.g.*, *Cannice v. Norwest Bank Iowa*, 189 F.3d 723, 726 (8th Cir. 1999); *Walton*, 168 F.3d at 667; *Wallin*, 153 F.3d at 688. That was plainly not the situation here; all of the verbal harassment directed at Fox and the other disabled workers, terms such as "handicapped MF," and "hospital people," expressly referenced their disabilities and resulting medical restrictions. Further, requiring Fox to perform tasks beyond his medical restrictions, as Okal and Dame did, certainly targeted that disability. Thus, the harassment at issue in this case was not mere "workplace friction" unrelated to Fox's disability, *Wallin*, 153 F.3d at 688, but rather abuse directly attributable to Fox's medical condition.

Moreover, the harassment Fox suffered was far more severe and pervasive than the harassment experienced by the plaintiffs in the

cases cited by GM. In each of those cases, the court noted that the incidents relied on by the plaintiffs to create a hostile work environment were too "isolated," *Wallin*, 153 F.3d at 688, or amounted to no more than "a few harsh words." *McConathy*, 131 F.3d at 564; *see also Cannice*, 189 F.3d at 726 (harassment not severe or pervasive where only two incidents "could even colorably be connected" to plaintiff's disability). Here, we are presented with evidence not of a few isolated incidents of harsh language, teasing, or insensitivity, but rather of regular verbal harassment and occasional physical harassment over a period of nearly ten months directed at Fox because of his disability.

In sum, Fox presented evidence of objectively severe and pervasive workplace harassment. We, therefore, cannot disturb the jury's finding in his favor.

## IV.

GM also challenges the jury award to Fox of $200,000 in compensatory damages, $3,000 in medical expenses, and $4,000 in lost overtime.

## A.

Under the ADA, compensatory damages are available for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). GM contends, however, that the evidence adduced at trial does not support the jury's award of $200,000 in compensatory damages.

"A jury's award of damages stands unless it is grossly excessive or shocking to the conscience." *O'Rourke v. City of Providence*, 235 F.3d 713, 733 (1st Cir. 2001) (internal quotation marks omitted); *see also Hetzel v. County of Prince William*, 89 F.3d 169, 171 (4th Cir. 1996) (holding that a jury's award of compensatory damages will be set aside on the grounds of excessiveness only if the verdict is against the clear weight of the evidence or will result in a miscarriage of justice). Courts defer to a jury's award of damages for intangible harms, such as emotional distress, "because the harm is subjective and evalu-

ating it depends considerably on the demeanor of the witnesses." *Giles v. Gen. Elec. Co.*, ___ F.3d ___, 2001 WL 184579, at \*9 (5th Cir. Feb. 26, 2001) (upholding award of $100,000 in compensatory damages for ADA plaintiff who suffered sleeplessness, headaches, marital difficulties and lost "the prestige and social connections associated with his position" as a result of employer's actions).

Fox testified that he suffered anxiety, severe depression, and a worsening of his already fragile physical condition as a result of the constant harassment and humiliation he experienced at the hands of his supervisors at GM. Both Fox's neurologist, Dr. Liberman, and his psychiatrist, Dr. Soule, offered testimony that supported these claims. Although Fox's depression admittedly had other causes, such as his health and personal problems, there can be no doubt that it was at least in part attributable to the hostile work environment at GM. Furthermore, the worsening of Fox's back injury, which led to increased pain and suffering, appears to have been triggered solely by the harassment Fox experienced at work.

Given Fox's testimony as to the specific nature of his "emotional pain, suffering, inconvenience, mental anguish, [and] loss of enjoyment of life," 42 U.S.C. § 1981a(b)(3), and the corroboration of his claim by medical professionals, we cannot conclude that the $200,000 award was "grossly excessive or shocking to the conscience". *O'Rourke*, 235 F.3d at 733. *See also Hogan v. Bangor & Aroostook R.R. Co.*, 61 F.3d 1034, 1037-38 (1st Cir. 1995) (upholding $200,000 compensatory damages award to ADA plaintiff who "became depressed, withdrawn, and gave up his usual activities" due to employer's refusal to allow him to return to work after work-related injury).[4]

---

[4]GM also contends that we should reduce the compensatory damages award to reflect the fact that Fox received workers' compensation after he left work on disability leave in mid-August 1995. However, the compensatory damages award and the workers' compensation benefits did not serve the same purpose or compensate for the same period. The compensatory damages award was designed to compensate Fox for his nonpecuniary losses, such as pain and suffering, because of harassment from October 1994 to mid-August 1995, whereas the workers' compensation benefits Fox received compensated him for the wages he lost due to his inability to work after mid-August 1995.

## B.

GM maintains that the jury's award of $3,000 for medical expenses — specifically Fox's psychiatric expenses related to treatment for depression — should be overturned because the evidence assertedly demonstrated that Fox's personal problems, rather than any workplace harassment, necessitated depression counseling. As indicated above, Dr. Soule testified that multiple factors, some of which were personal in nature, caused Fox's depression. But Dr. Soule also confirmed that the harassment Fox experienced at work caused some of Fox's depression. Obviously, the jury carefully considered all of this testimony; although Dr. Soule testified that Fox's medical expenses for his psychiatric treatment totaled approximately $6,000, the jury awarded Fox only $3,000 in medical expenses. Thus, the jurors decided that some portion, but not all, of the expenses, should be charged to GM, and they calculated the award accordingly. We can find no error in this award.

## C.

GM's final contention — that the jury's award of $4,000 for unpaid overtime is unjustified — is more persuasive. In support of his claim that GM discriminated against him because of his disability, Fox testified that Okal denied him the opportunity to work overtime because of his disability. The jurors found, however, that GM had *not* intentionally discriminated against Fox; rather, they only found for Fox on his hostile work environment claim.

We cannot reconcile the jury's verdict for GM on the discrimination claim with its award to Fox of unpaid overtime. If GM prevented Fox from working overtime because of his disability, then it intentionally discriminated against him based on disability. But, in this case, the jury concluded that GM did *not* intentionally discriminate against Fox. The finding of no intentional discrimination precludes a finding that GM denied Fox overtime because of his disability. Accordingly, we vacate the award for lost overtime pay.[5]

---

[5]GM also raises several challenges to the district court's instructions on damages. We review challenges to jury instructions for abuse of dis-

## V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART AND REVERSED IN PART*.

---

cretion. *See United States v. Helem*, 186 F.3d 449, 454 (4th Cir. 1999). "A judgment will be reversed for error in jury instructions only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Abraham v. County of Greenville*, 237 F.3d 386, 393 (4th Cir. 2001) (internal quotation marks omitted). We have examined GM's contentions and the record, and conclude that the district court did not abuse its discretion in instructing the jury, nor did the instructions cause any discernible prejudice to GM.