**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

REBEKAH HOMESLEY,
             *Plaintiff-Appellee,*
    and
MICHAEL HOMESLEY,
                   *Plaintiff,*

    v.                                           No. 02-1158

FREIGHTLINER CORPORATION,
             *Defendant-Appellant,*
    and
ROBERT YARBOROUGH, a/k/a Butch,
                        *Defendant.*

REBEKAH HOMESLEY; MICHAEL
HOMESLEY,
             *Plaintiffs-Appellants,*

    v.

FREIGHTLINER CORPORATION,                        No. 02-1242
             *Defendant-Appellee,*
    and
ROBERT YARBOROUGH, a/k/a Butch,
                        *Defendant.*

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Carl Horn, III, Chief Magistrate Judge.
(CA-98-134-3-H)

Argued: January 22, 2003

Decided: April 22, 2003

Before WIDENER and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** Raboteau Terrell Wilder, Jr., KILPATRICK STOCK-
TON, L.L.P., Charlotte, North Carolina, for Appellant. George Daly,
GEORGE DALY, PA, Charlotte, North Carolina, for Appellees. **ON
BRIEF:** Amy L. Layton, KILPATRICK STOCKTON, L.L.P., Char-
lotte, North Carolina, for Appellant. Anna Daly, COZEN &
O'CONNOR, Charlotte, North Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

**OPINION**

PER CURIAM:

   Following a jury trial, Rebekah Homesley (Homesley) was
awarded $200,000 in compensatory damages on her Title VII hostile

work environment claim against Freightliner Corporation (Freightliner). After a United States Magistrate Judge[1] entered judgment, Homesley was awarded $165,270.21 in attorney's fees and costs. On appeal, Freightliner challenges the jury's verdict, the jury's compensatory damage award, and the award of attorney's fees and costs. On cross-appeal, Homesley challenges the magistrate judge's decision not to include $3771 in the award of attorney's fees to account for a delay in payment and her husband, Michael Homesley, challenges the magistrate judge's decision to dismiss his loss of consortium claim against Freightliner. We affirm.

I

A

In 1995, Homesley began working as a "manual" welder at Freightliner's plant in Gastonia, North Carolina. As the group leader of manual and "spot" welders, Robert Yarborough (Yarborough) was Homesley's supervisor.

Some time after Homesley began working for Freightliner, Yarborough, on occasion, made lewd gestures and comments to Homesley. This sporadic conduct, which Homesley described as not "that bad," continued until 1997, when Yarborough's conduct became much more offensive.

On several occasions during the first half of 1997, Yarborough told Homesley he had just eaten lunch but had not known her name was lunch; told Homesley that he was going to eat lunch and then grinned and wiped his mouth; and scooted down in his chair, rolled his eyes, licked his lips and rubbed his groin area while staring at Homesley.

In February 1997, Yarborough came into a welding booth where Homesley and another manual welder were discussing how to weld a fixture. Yarborough rubbed Homesley on her breast, said she had dirt on her name tag, laughed, and left. Yarborough had rubbed her

---

[1]By consent of the parties, the case was tried before a United States Magistrate Judge. 28 U.S.C. § 636(c).

for several seconds and Homesley could feel the rubbing through her welding jacket.

Within a week, Homesley complained to Yarborough about his behavior.[2] She told Yarborough to stop touching her and to stop making lewd comments directed toward her. Yarborough replied that he was her boss and he would do as he liked and there was nothing she could do about it.

In April 1997, Yarborough came into Homesley's welding booth, and in the presence of two other manual welders, rubbed her breast as before, and again said she had dirt on her name tag, laughed, and left. Homesley immediately called Michael Tolbert (Tolbert), Freightliner's personnel manager, and asked him to come to her welding booth. When he arrived, Homesley asked him, "hypothetically speaking, what if an employee is having problems with sexual harassment?" After some pressure from Tolbert, Homesley told him it was Yarborough who was harassing her and "went in detail with what had happened." Tolbert suggested she have her husband "whip [Butch's] butt outside the gate." He then said he would give her the weekend to think it over and decide whether to "go and make a formal complaint."[3]

The following Monday, Homesley sought out Tolbert and told him she had decided not to pursue the matter. She did this because she feared for her job if she complained about Yarborough. Tolbert told her that he had already informed Buddy Kircus (Kircus), the plant manager, of the complaint. She said, "well, I guess I've messed up now" and walked away.

---

[2]The record reflects that Freightliner had several anti-harassment policies which outlined the rights of employees and the responsibilities of management. One of Freightliner's anti-harassment policies instructed an employee who believed she was being sexually harassed to report the sexual harassment to her supervisor. Another policy indicated that, if an employee was sexually harassed by a supervisor, the employee "need not bring the complaint to their . . . supervisor."

[3]One of Freightliner's anti-harassment policies required that formal complaints, informal complaints, and rumors of sexual harassment be investigated.

In June 1997, Yarborough again rubbed Homesley on her breast in front of a male coworker. The following month, while in her welding booth, Homesley bent over a basket looking for a welding part. Yarborough stealthily came up behind her and got "right up on [her]" and said "at least I've caught you in the right position."

On July 12, 1997, Rita Chitwood (Chitwood), a spot welder, came to Homesley's welding booth and saw her crying. Homesley told her of the sexual harassment by Yarborough. Chitwood said Yarborough had been doing the same thing to her and to Tona Collins (Collins), another spot welder. In fact, in early 1997, Yarborough made vulgar remarks directed at Chitwood and, on one occasion, rubbed Chitwood's arm and tried to slip his hand under her sleeve. Chitwood complained to Jerry Lang (Lang), the departmental supervisor, "a couple of months" before July 1997 about Yarborough rubbing her arm, trying to reach up her sleeve and his vulgar talk. In response, Lang said "he's just kidding, [and] he don't mean nothing by it." In June 1997, Yarborough grabbed Chitwood by her belt loop and tried to pull her onto his lap, in the presence of a male coworker. In late June or early July 1997, Yarborough was eating yogurt or pudding at his desk when Chitwood came to get a work order. Yarborough asked Chitwood if she had ever been eaten like pudding.

After speaking with Homesley on July 12, 1997, Chitwood went to Lang and complained again. Chitwood told Lang, among other things, that Yarborough was harassing Homesley and Collins. Lang told her that "he had been hearing some things, some rumors, but he couldn't do anything about it until the individuals came to him and told him specifically what had happened."

Homesley then went to Lang's office and spoke with him for about five minutes. She told him that Yarborough had touched her on her breast and made lewd gestures and remarks. After listening to Homesley, Lang said "well, I guess I'm going to have to do something about it now."

Collins went to Lang that same day and told him that, in the past six months, Yarborough had asked her to unbutton her blouse, had looked at her butt and licked his lips and said "that looks good," and had asked her if he could have her unlisted home number.

Lang talked to Yarborough later that day. Yarborough told Lang he "could have told [Collins] to let me button it up instead of unbuttoning it"; he "could have made" the in-the-right-position remark; and he "thought he did brush lint off Becky's [Homesley's] badge."

Yarborough continued as group leader the following Monday and Tuesday. On Tuesday, Lang reported the matter to Kircus and to Michael Holloman (Holloman), who had recently replaced Tolbert as personnel manager. Thereafter, Lang and others met separately with Homesley, Chitwood, and Collins to discuss Yarborough's conduct.[4]

The next day, Holloman, Lang, and Kircus met with Yarborough for about forty-five minutes. A written warning which had been prepared the previous day was given to him at this meeting. This warning read:

SUBJECT: WRITTEN WARNING FOR UNACCEPT-
ABLE BEHAVIOR
TO: PERSONNEL FILE OF BUTCH YARBOROUGH

FROM: MIKE HOLLOMAN/JERRY LANG
DATE: 7/1[6]/97

JERRY LANG AND I [Holloman] MET WITH BUTCH ON TUESDAY, 7/15, TO DISCUSS THREE DIFFERENT COMPLAINTS THAT WERE MADE ABOUT HIM BY THE FOLLOWING EMPLOYEES:

BECKY HOMESL[E]Y
RITA CHITWOOD
TONA COLLINS

THE COMPLAINTS WERE OF A SEXUAL RELATED NATURE AND WERE VIEWED TO BE SERIOUS. AS A RESULT OF THIS WE DECIDED IT WAS NECESSARY TO DOCUMENT THIS SITUATION IN A FORMAL

---

[4]One of Freightliner's anti-harassment policies required that sexual harassment complainants be interviewed by "an appropriate person of the same sex."

MANNER. BUTCH WAS TOLD NOT TO ENGAGE IN THIS TYPE BEHAVIOR AGAIN. IF HE DOES HE COULD BE GIVEN FURTHER DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION.

When Yarborough was presented with this document he became angry and "repeatedly stated that he thought he was being framed [and] had been setup" and refused to sign the document. Only Holloman and Lang signed.

Yarborough remained the group leader all that week. Homesley continued to receive her work assignments from Yarborough, and he began to persistently stalk and stare at her. According to Homesley, Yarborough was "watching everything that I was doing." He also stared at Chitwood in an intimidating manner.

Later in the week, when the complainants still had heard nothing of any discipline of Yarborough and the persistent staring and stalking was continuing, they asked Lang to be allowed to meet as a group with Holloman. No group meeting was allowed, but on Friday each was allowed to meet individually with Lang and Holloman. As Lang was escorting Homesley through the plant to her meeting someone yelled out, "there goes sexual harassment" and laughed. Lang just kept on walking. During the meeting, Homesley told Holloman and Lang that Yarborough was stalking and staring at her.

Yarborough remained Homesley's group leader the next day. When Homesley came in, a welding job was already set up in her booth. Yarborough then added on a difficult additional job involving a very heavy fixture, which required Homesley to get help from two coworkers to get the fixture into her booth. During this time, Yarborough paced in front of her booth seven or eight times, writing notes in a book. He had never before engaged in any such note-taking. Then, he came into her booth and ordered her coworkers to leave. At the time, they were helping her with the heavy fixture. At this, Homesley dissolved into tears. She went to Lang and said Yarborough was still stalking her. Lang took her, crying, to the office of the production manager, who appeared indifferent to her situation. Homesley was too upset to go back to work that day. Homesley returned to work the following Monday but spent a part of the day

testing for another job, which would have put her in a different department from Yarborough, at reduced pay. On Tuesday, without any announcement, Yarborough was transferred to be the group leader of the assembly area, which was about 100 feet away from Homesley's work station.

After less than three weeks in his new location, Yarborough was demoted for making derogatory remarks to Linda Mooneyham, a woman in his new group, about her handicap. Homesley then heard that Yarborough might be assigned back to her work area as a welder. Homesley told Lang that having Yarborough as a coworker would be a problem, but he said he could not do anything about it. Chitwood then telephoned the former plant manager, now working in the corporate headquarters, and he intervened and caused Yarborough to be assigned to a different department. Yarborough's new location was again only 100 feet away from Homesley's work station. There was no business-related reason for him to come to their area, but he continued to return and stare at Homesley and Chitwood. Chitwood went to see Kircus and asked to have Yarborough avoid their area. Kircus told her she was being "ridiculous."

Homesley and Yarborough were one or the other absent on medical leave from mid-August until November 1997. A few days after Homesley returned, Lang called her to his desk and showed her an e-mail from Kircus which said that, "for [Yarborough's] protection," she was to start using a restroom more distant from her work station. Homesley was in the habit of using the nearest restroom, which was between her work station and Yarborough's work station. Homesley asked for a copy of the e-mail, but Lang refused to give it to her. Homesley became upset and asked to meet with Kircus. Kircus told Homesley that he had issued his bathroom directive "for [Yarborough's] protection, that [Yarborough] had bills to pay just like [she] did and he was trying to keep [Yarborough] a job."

As a result of Yarborough's conduct, Homesley experienced crying spells, fatigue, difficulty sleeping, anhedonia, decreased libido, poor concentration, and feelings of worthlessness. In March 1998, Homesley was diagnosed as "extremely depressed" and "not able to function" at work. She was prescribed anti-depressant medication and was written out of work for a week. A week later, Homesley's medical

leave was extended to a month because she continued to be unable to function at work.

Dr. Francis Daly, a psychiatrist, diagnosed Homesley as having a "major depression, single episode, severe," commencing in April 1997 because of the sexual harassment by Yarborough. Homesley's symptoms were "decreased mood, anhedonia, very prominent feelings of worthlessness, feelings of guilt that she has put her job in jeopardy and therefore put her family in jeopardy, significant feeling of hopelessness, decreased energy, decreased concentration, decreased sleep, sleep continuity problems, [and] weight gain." Dr. Thomas Harding (Dr. Harding), another psychiatrist, gave Homesley a "global assessment of functioning" of fifty out of 100, indicating that she was "having a hard time maintaining activities of daily living, including bathing and sleeping and working."

Homesley suffered from flashbacks and constant headaches and, in the summer of 1998, Dr. Harding diagnosed post-traumatic stress disorder because of the sexual harassment. Homesley was on leave for depression and post-traumatic stress disorder for about two months in 1998 and for several months at the end of 1999. She continued to suffer crying spells, fatigue, insomnia, and lack of concentration. In her flashbacks, "in a flooded type of way, all of the emotion, all of the fearfulness c[ame] back almost as if the event [were] occurring again." Homesley relived Yarborough "feeling her breast." She had the flashbacks frequently, both on the job and at night. Homesley also had "recurring episodes of depression."

Homesley's condition improved somewhat in the summer of 1998, but by November of that year her "depression was much worse." When she was on medical leave, she felt like "a zombie" and spent days in bed crying, avoiding her friends, and rarely leaving her house. Homesley's depression caused difficulties in her relationships with her husband and son. "I had stopped doing the things that we loved to do. I stopped doing anything." In May 1999, she exhibited fatigue, poor concentration, and anhedonia. In the summer of 1999, Homesley was suffering from a "severe depression." In early 2000, Dr. Harding certified Homesley to be disabled for any occupation. "She was tearful, unable to sleep, unhopeful about her future . . . [and] unable to

concentrate." Dr. Harding felt that Homesley's lack of concentration was potentially dangerous on her job.

Homesley was on disability leave for depression and post-traumatic stress disorder for about twenty-four weeks altogether after July 1997 and took six different psychotropic medications. Previously, she had been on disability leave only for childbirth. In June 2000, her global assessment of functioning was sixty-five, indicating that she had symptoms of depression but was nevertheless able to work. Homesley's condition gradually began to improve in late 2000 and by the time of trial a year later she was on the way to recovery. At the present time, Homesley continues to work for Freightliner.

B

On March 31, 1998, Homesley and Michael Homesley brought this action against Yarborough and Freightliner in the United States District Court for the Western District of North Carolina. Count One alleged that the defendants assaulted and battered Homesley in violation of North Carolina law. In Count Two, Homesley alleged, among other things, that she was subjected to a hostile work environment because of her sex in violation of Title VII, 42 U.S.C. § 2000e *et seq.* In Count Three, Michael Homesley asserted a loss of consortium claim against the defendants. The parties consented to proceed before a United States Magistrate Judge. By stipulation of the parties, Yarborough was dismissed as a defendant before trial. Prior to trial, the magistrate judge dismissed the claims for assault and battery and loss of consortium, and the case proceeded to trial on the hostile work environment claim.

At trial, the jury affirmatively answered "issues" that found:

(1)   Yarborough sexually harassed Homesley while both were employed by Freightliner;

(2)   Yarborough was Homesley's supervisor and this status aided his harassment;

(3)   Freightliner did not prove that it used reasonable care to prevent and correct sexual harassment and that

Homesley failed to take advantage of preventive or corrective opportunities provided by Freightliner;

(4) Homesley proved that supervisory employees of Freightliner knew or should have known of Yarborough's conduct and failed to take prompt and adequate remedial action; and

(5) Homesley was entitled to recover $200,000 in compensatory damages from Freightliner.

Following the entry of the judgment, Freightliner unsuccessfully challenged the jury's verdict, filing motions for judgment as a matter of law or, in the alternative, for a new trial and/or remittitur. As the prevailing party, Homesley made a motion for attorney's fees, which the magistrate judge granted. Freightliner noted a timely appeal and the Homesleys filed a timely cross-appeal.

II

Freightliner argues that there is insufficient evidence in the record to support the jury's verdict in favor of Homesley on her hostile work environment claim. We review the denial of a Rule 50 motion for judgment as a matter of law *de novo. Chaudhry v. Gallerizzo*, 174 F.3d 394, 404 (4th Cir. 1999). If, viewing the facts in the light most favorable to Homesley as the nonmoving party, there is sufficient evidence for a reasonable jury to have found in her favor, we cannot disturb the jury's verdict. *See, e.g., Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991). While we "are compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them," *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996), we must grant judgment as a matter of law when "there is no legally sufficient evidentiary basis" for the verdict. Fed. R. Civ. P. 50(a)(1).

Title VII of the Civil Rights Act of 1964 forbids employers from engaging in actions that "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by

proving that discrimination based on sex created a hostile or abusive work environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986); *see also Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241 (4th Cir. 2000) ("An employee's work environment is a term, condition, or privilege of employment. . . . A cause of action therefore may exist under Title VII if sexual harassment creates a hostile work environment or abusive atmosphere."). Such a showing requires that the plaintiff demonstrate both that the harassment was because of her sex and that it created a hostile work environment. *Smith*, 202 F.3d at 241-42. The requirement that harassment be "because of sex" does not mandate that the harassment include sexual advances or propositions. *Id.* at 242. Rather, the "critical issue" is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (citation and internal quotation marks omitted).

To prevail on her Title VII hostile work environment claim, Homesley must establish four elements: (1) unwelcomed conduct; (2) based on Homesley's gender; (3) sufficiently severe or pervasive to alter the conditions of employment and to create a hostile work environment; and (4) some basis for imputing liability to Freightliner. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001); *see also Smith*, 202 F.3d at 241.

The parties do not dispute that there is sufficient evidence in the record to support the jury's finding in favor of Homesley on the first three elements, which the jury essentially decided under the first "issue" it answered. Accordingly, we only need to address the fourth element.

Once a plaintiff has demonstrated that the harassment was unwelcomed, because of her sex, and was sufficiently severe or pervasive, the plaintiff must show that her employer bears responsibility for the harassment. If the harassing party was the plaintiff's supervisor, the employer will be strictly liable where the harassment culminated in a tangible employment action against the plaintiff. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). If the harassing supervisor did not punctuate his harassment with a tangible employment action, the

employer can avoid liability by establishing (1) that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

Homesley concedes that there was no tangible employment action taken against her. Accordingly, Freightliner is entitled to raise the affirmative defense outlined in *Faragher* and *Ellerth*.

We conclude that Freightliner cannot show that it was entitled, as a matter of law, to the *Faragher*/*Ellerth* affirmative defense. The first part of the affirmative defense requires Freightliner to prove that it, among other things, exercised reasonable care to promptly correct any sexually harassing behavior. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. The evidence in the record, viewed in a light most favorable to Homesley, clearly does not support the conclusion that Freightliner acted reasonably. First, Homesley's complaint to Yarborough in February 1997 and her May 1997 complaint to Tolbert were not investigated at all. When Chitwood complained to Lang in the spring of 1997 about Yarborough's attempt to slip his hands under her clothing, Lang said that Yarborough was "just kidding, [and] he don't mean anything by it." When Chitwood complained again, Lang excused his failure to investigate her earlier complaint by saying that he had heard "some rumors" but could not take action until the affected individuals complained. Lang's approach violated one of Freightliner's anti-harassment policies which required that rumors of sexual harassment be investigated. It was not until Homesley, Chitwood, and Collins complained on the same day that Lang decided to take action. This evidence suggests that Freightliner was not interested in preventing, let alone correcting, sexual harassment in the work place. Second, when Yarborough continued to harass Homesley by stalking and staring at her, *cf. Frazier v. Delco Elecs. Corp.*, 263 F.3d 663, 667 (7th Cir. 2001) (noting that stalking is a "characteristic form of male aggression toward women"), Freightliner essentially ignored Yarborough's behavior. It was only when Homesley broke down and had to leave work before something was done. The remedy —moving Yarborough 100 feet away—was grossly inadequate and did nothing to stop Yarborough's continued stalking and staring. Finally, management failed to comply with several of Freightliner's

policies designed to correct sexually harassing behavior. In sum, not-withstanding the existence of Freightliner's anti-harassment policies, the evidence in the record, viewed in a light most favorable to Homesley, does not support the conclusion that Freightliner met the first part of the *Faragher/Ellerth* affirmative defense.

Freightliner fares no better under the second part of the affirmative defense, which requires Freightliner to prove that Homesley unreasonably failed to take advantage of any preventive or corrective opportunities that Freightliner provided. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. Freightliner essentially concedes that Homesley, in compliance with Freightliner's anti-harassment policies, complained of Yarborough's conduct to her supervisor (who happened to be Yarborough) in February 1997. However, Freightliner argues that Homesley acted unreasonably when she did not complain to Yarborough in 1995, but rather waited until February 1997 to do so.

Unquestionably, it was a jury question on the second part of the *Faragher/Ellerth* affirmative defense. Homesley testified that Yarborough's *isolated* conduct was not "that bad" from 1995 through the end of 1996. This testimony suggests that Yarborough's *isolated* conduct from 1995 through the end of 1996 was not sufficiently pervasive or severe to alter the conditions of Homesley's employment and to create a hostile work environment. *Cf. Matvia*, 259 F.3d at 270 (holding that plaintiff could not be excused from reporting sexual harassment on December 16, 1997 where the sexual harassment from September 1997 through December 15, 1997 was "persistent"). In February 1997, the sexual harassment intensified. Indeed, before 1997, there was no touching of Homesley and there appears to be no incident at all as to Chitwood or Collins. When Homesley was touched and the harassment went from sporadic to persistent, Homesley promptly complained about the unwelcomed conduct to her supervisor in compliance with Freightliner's anti-harassment policies. Under these circumstances, a jury could properly conclude that Homesley did not unreasonably fail to take advantage of any preventive or corrective opportunities that Freightliner provided. *Cf. Watts v. Kroger Co.*, 170 F.3d 505, 510-11 (5th Cir. 1999) (holding that, even though some sexual harassment occurred in 1993, it intensified

in the spring of 1994 and a jury could find that waiting until July 7, 1994 to complain was not unreasonable).

### III

Freightliner also attacks several portions of the magistrate judge's instructions to the jury concerning the *Faragher/Ellerth* affirmative defense. In reviewing the adequacy of a trial court's chosen jury instructions, we allow the trial court much discretion and will not reverse as long as the instructions, taken as a whole, adequately state the controlling law. *United States v. Hassouneh*, 199 F.3d 175, 181 (4th Cir. 2000).

With regard to the *Faragher/Ellerth* affirmative defense, the magistrate judge instructed the jury as follows:

> [I]f you answer the question about supervisory authority aiding sexual harassment in the affirmative, the defendant, Freightliner, is liable for the sexual harassment unless it proves by the greater weight of the evidence both that it exercised reasonable care to prevent and promptly correct sexual harassment and that the plaintiff, Rebekah Homesley, unreasonably failed to take advantage of preventative or corrective opportunities which Freightliner provided.
>
> * * *
>
> To determine if Freightliner exercised reasonable care to prevent any sexually harassing behavior, you should consider both any sexual harassment policy Freightliner Corporation may have had and how it administered the policy when complaints were received.
>
> You may consider, for example, the extent to which defendant, Freightliner Corporation, followed its own regulations in handling plaintiff, Rebekah Homesley's complaints; the promptness or lack of promptness of its investigation of them, the effectiveness or ineffectiveness of actions taken against Mr. Yarborough, whether its harassment policy was

designed to encourage victims of harassment to come forward, whether it adequately trained Mr. Yarborough as to his duty to avoid sexual harassment in employment and any other circumstances arising from the evidence and its greater weight which tend to show that defendant, Freightliner Corporation, did or did not take reasonable care to prevent Mr. Yarborough's sexual harassment of plaintiff, Rebekah Homesley.

In determining whether Freightliner Corporation exercised reasonable care to prevent sexual harassment, whether or not specific training was given is only one factor for you to consider. In other words, you should consider whether or not specific training in sexual harassment was given together with all other relevant evidence to determine whether the company acted reasonably or unreasonably.

Similarly, whether the defendant, Freightliner, followed its own internal policies and procedures in responding to the sexual harassment complaints is another factor for you to consider in determining whether the company acted reasonably.

In other words, while a company's failure to follow its own policies or procedures may be evidence of unreasonableness, it is also possible for you to conclude that the company failed to follow its own policies or procedures but, nevertheless, took other steps and actions to make its overall response to the sexual harassment complaint in this case reasonable and adequate.

As to whether defendant, Freightliner, has shown that Rebekah Homesley unreasonably failed to take advantage of any corrective or preventative opportunities it provided, you may consider whether the delay, if any, in reporting her allegations of sexual harassment was an unreasonable delay in light of all the evidence which has been admitted.

Under the law a person has a duty to report misconduct promptly even if she is embarrassed or afraid of retaliation

> from co-workers or managers so that the company has an opportunity to correct the problem internally.

> Fear that report — the report will be ineffective does not relieve an employee of her obligation to report misconduct promptly. For example, reporting is required even if the employee believes friendships of management and/or other employees makes it less likely that the company will take appropriate action.

> In deciding whether the plaintiff acted reasonably in complaining [about] the misconduct you should consider all of the alleged harassment that forms the basis of her complaint, not just conduct you consider more egregious.

Freightliner argues that the magistrate judge should have instructed the jury that "Freightliner's policies were compelling or even just strong evidence of reasonableness." Appellant's Br. at 10; *cf. Matvia*, 259 F.3d at 268 ("Our cases have held that dissemination of an effective anti-harassment policy provides compelling proof that an employer has exercised reasonable care to prevent and correct sexual harassment.") (citation and internal quotation marks omitted). In our view, no "compelling proof" instruction was required under *Faragher* and *Ellerth*.

First, the first part of the *Faragher/Ellerth* affirmative defense asks the jury to assess the reasonableness of the employer's action in preventing and correcting sexually harassing behavior in the work place. As with most reasonableness determinations, in making the reasonableness determination under the first part of the *Faragher/Ellerth* affirmative defense, the jury must focus on a multitude of factors. While the existence of an anti-harassment policy may be more probative (and thus more "compelling") on the question of the reasonableness of the employer's actions, it does not follow that the jury should be specifically instructed that an effective anti-harassment policy provides compelling proof that an employer has exercised reasonable care to prevent and correct sexual harassment. Rather, it is the jury's responsibility to assess what weight should be given to each piece of evidence. Put simply, we are confident that the jury on its own can discern what evidence is more compelling than other evidence before

it, so no separate instruction is required. Second, we do not read Supreme Court precedent or the precedent from this circuit as requiring that we turn the first part of the *Faragher*/*Ellerth* affirmative defense into a burden shifting scheme, requiring the defendant to demonstrate that the effective policy exists and then requiring the plaintiff to demonstrate that the policy was implemented in bad faith or that the defendant was deficient in enforcing it. After all, the first part of the *Faragher*/*Ellerth* affirmative defense is just that, an affirmative defense—the plaintiff carries no evidentiary burden in proving its elements.

Freightliner also argues that the magistrate judge should have specifically instructed the jury that it must consider Yarborough's 1995 and 1996 sporadic lewd conduct in determining whether Homesley promptly availed herself of Freightliner's corrective measures. In another argument, Freightliner argues that the jury should have been instructed that Freightliner was legally justified in not investigating Yarborough when Homesley instructed Tolbert not to investigate. These proposed instructions, which both relate to the issue of whether Homesley unreasonably failed to take advantage of any preventive or corrective opportunities that Freightliner provided, were substantially covered by the magistrate judge's instructions: (1) that "[u]nder the law a person has a duty to report misconduct promptly even if she is embarrassed or afraid of retaliation from co-workers or managers so that the company has an opportunity to correct the problem internally"; (2) to "consider all of the alleged harassment that forms the basis of her complaint, not just the conduct you consider more egregious"; and (3) to "consider whether the delay, if any, in reporting her allegations of sexual harassment was an unreasonable delay in light of all the evidence which has been admitted." Thus, the magistrate judge's instruction, taken as a whole, adequately stated the controlling law. *Hassouneh*, 199 F.3d at 181.

IV

Freightliner challenges the jury's award of $200,000 in compensatory damages. Under Title VII, compensatory damages are available for, among other things, "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). Freightliner contends that the evi-

dence adduced at trial does not support the jury's award of $200,000 in compensatory damages.

"'A jury's award of damages stands unless it is grossly excessive or shocking to the conscience.'" *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 180 (4th Cir. 2001) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 733 (1st Cir. 2001)); *see also Hetzel v. County of Prince William*, 89 F.3d 169, 171 (4th Cir. 1996) (holding that a jury's award of compensatory damages will be set aside on the grounds of excessiveness only if the verdict is against the clear weight of the evidence or will result in a miscarriage of justice). We defer to a jury's award of damages for intangible harms, such as emotional distress, "because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *Fox*, 247 F.3d at 180 (citation and internal quotation marks omitted).

In our view, the $200,000 compensatory damage award is not excessive. The record demonstrates that Homesley's depression had its onset in the spring of 1997; that her psychiatrist testified that her depression and post-traumatic stress syndrome were caused by Yarborough's sexual assaults; that for considerable periods of time over the next few years her illnesses were severe and physically debilitating; that she was on medical leave for approximately twenty-four weeks over a two and one-half year period and required major doses of psychotropic medications; that because of her post-traumatic stress disorder, also occasioned by the sexual assaults, she suffered debilitating flashbacks; and that these illnesses had a devastating effect on her weight, her family, and her social life.

In *Fox*, we upheld a $200,000 compensatory damage award for a hostile work environment claim under the ADA. In that case, we observed:

> Fox testified that he suffered anxiety, severe depression, and a worsening of his already fragile physical condition as a result of the constant harassment and humiliation he experienced at the hands of his supervisors at GM. Both Fox's neurologist, Dr. Lieberman, and his psychiatrist, Dr. Soule, offered testimony that supported these claims. Although Fox's depression admittedly had other causes, such as his

health and personal problems, there can be no doubt that it was at least in part attributable to the hostile work environment at GM. Furthermore, the worsening of Fox's back injury, which led to increased pain and suffering, appears to have been triggered solely by the harassment Fox experienced at work.

Given Fox's testimony as to the specific nature of his emotional pain, suffering, mental anguish, and loss of enjoyment of life, . . . and the corroboration of his claim by medical professionals, we cannot conclude that the $200,000 award was grossly excessive or shocking to the conscience.

*Id.* at 180 (citations and internal quotation marks omitted). The injuries in *Fox* are sufficiently analogous to the injuries in this case. Moreover, like *Fox*, Homesley's testimony concerning her injuries was corroborated by medical professionals. Under *Fox*, we must conclude that the jury's $200,000 compensatory damage award is not excessive.

V

The parties raise additional arguments which they contend should be resolved in their favor. Freightliner argues that the magistrate judge erred when he admitted certain evidence concerning Yarborough's stalking and staring and erred in calculating the award of attorney's fees. On cross-appeal, Homesley argues that the magistrate judge erred when he declined to include $3771 in the award of attorney's fees to account for a delay in payment and her husband argues that the magistrate judge erred when he dismissed his loss of consortium claim against Freightliner. We have reviewed these arguments and find them to be without merit. Accordingly, for the reasons stated herein, the judgment of the court below is affirmed.

*AFFIRMED*