Ricky FLEETWOOD

v.

HARFORD SYSTEMS INC.

No. Civ.CCB–03–1990.

United States District Court,
D. Maryland.

March 4, 2005.

Lisa Naomi Weintraub Schifferle, Legal Aid Bureau, Riverdale, MD, Helen Norton, Teresa K. LaMaster, University of Maryland School of Law, Baltimore, MD, for Ricky Fleetwood.

Jeanne M. Phelan, Whiteford Taylor and Preston LLP, Baltimore, MD, for Harford Systems Inc.

**(REVISED)** *MEMORANDUM*

BLAKE, District Judge.

Plaintiff Ricky Fleetwood brings this action against his former employer, defendant Harford Systems Inc. ("HSI"), alleging several claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Fleetwood argues that HSI discriminated against him because he is dyslexic. Pending before the court are Fleetwood's motion for partial summary judgment and HSI's motion for summary judgment. For the reasons set forth below, Fleetwood's motion will be denied and HSI's motion will be granted in part and denied in part.

**I.**

HSI is engaged in the custom fabrication of stainless steel and sheet metal parts and the use of these parts to assemble various items, including animal cages for transportation, laboratory, and housing use. Fleetwood interviewed for the position of Beadblast Specialist on November 23, 1998. (Def.'s Mot. for S.J. at Ex. 4, Employment Application; *Id.* at Ex. 12, Fleetwood Dep. at 101–102.) A "Beadblast Specialist" uses special equipment to remove weld discolorations and rust spots from metal parts. (Def.'s Mot. for S.J. at Ex. 1, Job Description; *Id.* at Ex. 12, Fleetwood Dep. at 125.) Fleetwood's interview was conducted by Alphonse Cannon, who was then the beadblast supervisor. (*Id.* at Ex. 13, Cannon Dep. at 10–12.) During the interview, Cannon explained the duties of the position, including the technical process of beadblasting and the need to complete timecards that record the work performed each day. (*Id.* at 11–12.) Cannon also explained that if Fleetwood were hired, he would be subject to a 90–day probationary period. (*Id.* at 33–36; Def.'s Mot. for S.J. at Ex. 12, Fleetwood Dep. at 98–99.) HSI used this period to

evaluate new employees, and Cannon informed Fleetwood that at the completion of the 90 days, if HSI decided to hire him permanently, he would be eligible to be considered for a pay increase. (*Id.*)

Fleetwood testified that at the end of the interview, he told Cannon that he had dyslexia and, as a result, had difficulties reading and writing. (Def.'s Mot. for S.J. at Ex. 12, Fleetwood Dep. at 97.) Cannon allegedly said that they would address that issue if and when it came up. (*Id.*) Cannon, however, testified that Fleetwood did not mention dyslexia during the interview. (Def.'s Mot. for S.J. at Ex. 13, Cannon Dep. at 11.) Furthermore, HSI's application for employment, which Fleetwood filled out prior to his interview, included a statement that HSI would provide reasonable accommodations for the disabled, as well as a space for the applicant to list any accommodation he might need. (*Id.* at Ex. 4, Employment Application.) This space was left blank on Fleetwood's application. (*Id.*)

Shortly thereafter, HSI hired Fleetwood for the position, and he began work on November 30, 1998. (*Id.* at Ex. 12, Fleetwood Dep. at 102.) His first day of work consisted primarily of an orientation session for new employees conducted by Catherine Peloquin, the Human Resources Manager. (*Id.* at 103.) Fleetwood testified that he told Peloquin during his session that he was having difficulty completing the necessary paperwork because of his dyslexia. *Id.* Peloquin recalls that Fleetwood asked her for help because he was a slow reader, but denies that he ever mentioned having dyslexia. (Def.'s Mot. for S.J. at Ex. 14, Peloquin Dep. at 16, 18.) To assist him with the paperwork, Peloquin read many of the orientation materials to him, including HSI's anti-harassment policy. (*Id.* at 15.) This policy was entitled "Prohibition Against Sexual Harassment." (Pl.'s Mot. for S.J. at Ex.

20, Sexual Harassment Policy.) The document only mentions disability once: it states, "this notice to all of our employees is to reiterate that harassment in the workplace, based on a person's race, sex, religion, national origin, age, or disability will not be tolerated." (*Id.*)

After the orientation session, Cannon and other HSI employees provided Fleetwood with general training, including showing him how to fill out his timecard. (Def.'s Mot. for S.J. at Ex. 12, Fleetwood Dep. at 111; *Id.* at Ex. 13, Cannon Dep. at 24.) Fleetwood was required to keep track of the time he worked on each job. (*Id.* at 42, 110; *Id.* at 45.) When a part arrived for the beadblaster to work on, it would have a "move ticket" attached to it, which would contain the manufacturer order number for that particular part. (*Id.* at 112; *Id.* at 21, 46.) The order numbers consisted of an "M" followed by a six-digit number. (Def.'s Mot. for S.J. at Ex. 3, Timecards; *Id.* at Ex. 13, Cannon Dep. at 48.) The beadblaster would write the order number for that job on his timecard, as well as the time at which he started working on the job. (*Id.* at Ex. 13, Cannon Dep. at 46.) When he finished, he would write the time he stopped working, and then send the part on to the next department. (*Id.* at 47.) When he received the next part, he would repeat the same process. The timecard process enabled the payroll department to pay employees for the exact hours they worked. (*Id.* at 51.) More importantly, it allowed the accounting department to properly bill HSI's clients. (*Id.* at 52.) Each customer that used HSI to make animal cages would be billed based on the number of hours worked on the project, and within the bill would be itemized charges for the assorted types of work, for example, welding or beadblasting. (*Id.*) Thus, the timecards were necessary to ensure that the customers were billed fairly. (*Id.*)

The first record regarding Fleetwood's performance at HSI is a handwritten memo from Cannon in January 1999. (Pl.'s Mot. for S.J. at Ex. 5, Cannon's January Memo.) In it, Cannon explained that he had a meeting with Fleetwood regarding his problems filling out his timecards. (*Id.*) Cannon wrote that he had given Fleetwood a sample timecard to assist him, but that the problem persisted. (*Id.*) He stated that he was giving Fleetwood one week to correct the problem or else he would likely be terminated because "keeping his timecard accurate is solely his responsibility and a part of his continued employment here in my dept." (*Id.*)

At the end of the 90–day probationary period, pursuant to HSI policy, Cannon reviewed Fleetwood's performance. As part of the review, he filled out a performance evaluation that included eight categories on which the employee was to be rated. (Def.'s Mot. for S.J. at Ex. 7, Performance Evaluation.) In this form, which is dated February 26, 1999, Cannon marked Fleetwood as performing at the expected level for five categories and needing improvement in three categories. (*Id.*) In his deposition, Cannon testified that Fleetwood had problems following oral instructions, occasionally blasted parts incorrectly, and had difficulties with his timecards. (*Id.* at Ex. 13, Cannon Dep. at 43–44.) With respect to his timecards, Fleetwood often did not write down any manufacturer order number, or wrote the numbers in the wrong sequence. (*Id.* at 48–49.) According to Cannon, an employee would only receive a raise after the 90–day period if he performed at the expected level in all eight categories.[1] (*Id.* at 36.)

Cannon held a meeting with Fleetwood to discuss this review. (Pl.'s Mot. for S.J. at Ex. 6, Cannon's March Memo.) Despite his deposition testimony, Cannon's memorandum from the meeting with Fleetwood stated that, "[t]he main problem was his ability to fill out a timecard properly." (*Id.*) Indeed, Fleetwood testified that the only thing Cannon told him during this meeting was that he needed to improve his timecards. (*Id.* at Ex. 23, Fleetwood Dep. at 132.). At some point during their discussion, Fleetwood told Cannon that he had dyslexia. (*Id.* at Ex. 24, Cannon Dep. at 59.) He then showed Cannon certificates from vocational educational programs that he had completed and suggested that seeing a tutor might help him with the timecards. (*Id.* at 59, 64–65; *Id.* at Ex. 23, Fleetwood Dep. at 152.) Cannon told Fleetwood that he would talk to Peloquin and ask her to write a letter in order to get Fleetwood some reading help. (*Id.* at 65, 71.) He then informed Fleetwood that his continued employment at HSI depended on his successful completion of a reading program. (*Id.* at 64.)

Cannon wrote in his memorandum that Fleetwood "is a good worker and comes to work each day except when he's scheduled to be off. Therefore, I'm putting his evaluation on 'hold' until at such time [sic] he completes his program." (*Id.* at Ex. 6, Cannon's March Memo.) On March 2, 1999, he filled out a Personnel Activity Notice for Fleetwood's 90–day review, in which he wrote, "No increase at this time. When he complete [sic] his class/program successfully he will be re-evaluated for a possible increase." (*Id.* at Ex. 7, Personnel Activity Notice.) Cannon testified that he defined "successfully" completing the program as improving enough to be able to fill out a timecard properly without assistance. (*Id.* at Ex. 24, Cannon Dep. at 58.) He further stated that if Fleetwood showed this improvement, he would be reevaluated and "definitely, more than

---

1. This appeared from Cannon's testimony to be his own policy and not necessarily the practice of all HSI supervisors. (Pl.'s Mot. for S.J. at Ex. 24, Cannon Dep. at 36–37.)

likely, he would have gotten some sort of increase. There's no doubt about it." (*Id.* at 58–59.) Fleetwood contends that he was the only beadblaster not to receive a raise at the end of the 90–day period. HSI argues, however, that only those employees who were rated as performing at the expected level in all eight categories of the performance evaluation were given raises, unless HSI had reached a prior agreement with the employee.

Subsequently, Fleetwood went to the Vocational Rehabilitation Center at the Maryland Department of Education ("the Center") to meet Regina Diem, a counselor with whom he had worked in the past. (*Id.* at Ex. 23, Fleetwood Dep. at 140–41.) Diem told him that she was unable to provide him any assistance. (*Id.*) Fleetwood then told Peloquin about his reading problems and asked her to contact the Center, because Cannon had told him that if he did not get a tutor he would lose his job. (*Id.* at 139.) He testified that he hoped Peloquin would learn from Diem that his problems could not be fixed. (*Id.*) Cannon also had spoken to Peloquin about Fleetwood's difficulties. (*Id.* at Ex. 25, Peloquin Dep. at 50.) Peloquin wrote a letter to Diem on February 16, 1999. (*Id.* at Ex. 8, Peloquin Letter.) In the letter she explained that Fleetwood "has difficulty reading," and "needs help reading and writing" because his problems are interfering with his job. (*Id.*) She asked Diem to "help him get back on track with the classes." (*Id.*) Neither Peloquin nor anyone else at HSI had any further contact with Diem or other counselors at the Center after this letter was sent. (*Id.* at Ex. 25, Peloquin Dep. at 52.)

Cannon also instructed one of his senior beadblasters to work next to Fleetwood to help him fill out his timecards. (*Id.* at Ex. 24, Cannon Dep. 50, 88, 163.) Cannon testified that Fleetwood's performance on his timecards improved with the assistance from the senior employee. (*Id.* at 163.) However, this arrangement only lasted approximately one month, after which Cannon "turned [Fleetwood] loose on his own." (*Id.*) When he was working alone, Fleetwood's performance on the timecards declined again. (*Id.* at 164.)

When Fleetwood realized the Center would not help him, he contacted Harford Community College in search of assistance. (*Id.* at Ex. 23, Fleetwood Dep. at 87–88.) The college assigned Fleetwood to Ralph Whittman, a volunteer reading tutor from their Literacy Office. (*Id.* at 87, 89.) Fleetwood informed Cannon that he had found a tutor and gave him Whittman's contact information. (*Id.* at Ex. 24, Cannon Dep. at 56, 60.) Cannon called Whittman shortly thereafter to discuss Fleetwood's difficulty with timecards. (*Id.;* Def.'s Mot. for S.J. at Ex. 13, Cannon Dep. at 73.) He called Whittman again approximately one month later. (Def.'s Mot. for S.J. at Ex. 13, Cannon Dep. at 76.) During this second conversation, Whittman told Cannon that Fleetwood failed to attend some of their scheduled sessions. (*Id.*) Cannon told Fleetwood that he needed to focus on his lessons. (*Id.* at 76–77.) No further conversations occurred between Cannon and Whittman or between Cannon and Fleetwood regarding the tutoring. (*Id.* at 77.) Cannon testified, "I put enough into it. And Mr. Fleetwood said that he would make sure that he would be going to the classes ... I washed my hands of it at that point. I can only carry a person so long. That's it." (*Id.*) Neither Cannon nor Peloquin ever asked Fleetwood to confirm for them that he actually had dyslexia. (*Id.* at Ex. 14, Peloquin Dep. at 66, 72, 144; Pl.'s Reply to Def.'s Opp.'n at Ex. 30, Cannon Dep. at 90.) Furthermore, neither made any effort to ask or learn about the specific limitations Fleetwood's dyslexia caused him, or to determine whether Whittman

would be able to help him with his problems. (Def.'s Mot. for S.J. at Ex. 14, Peloquin Dep. at 45–46.)

In August, Cannon received a letter from Whittman stating that Fleetwood was "making headway in sounding out words and memorizing a few new words in each session." (*Id.* at Ex. 13, Cannon Dep. at 80.) Cannon testified that receiving this letter surprised him because he never got an update during the intervening months. (*Id.*) Moreover, he explained that Fleetwood had not shown any progress at work. (*Id.*) Cannon asserted that he was not interested in Fleetwood's ability to read books or pronounce vowels, and that he and Whittman had agreed that Fleetwood needed help filling out his timecards. (*Id.*)

According to Cannon, Fleetwood's performance in other areas of his job deteriorated once he learned that he would not be receiving a raise at the end of the 90–day probation period. Fleetwood was disciplined in mid–1999 for tardiness, attendance, and excessive breaks. (*Id.* at 66–67.) He did not receive a pay raise after six months of employment, another point at which HSI employees are evaluated and considered for an increase. (*Id.* at 162.)

In contrast, Fleetwood contends that once Cannon learned about his dyslexia, Cannon and other employees began rating him poorly. Both sides agree that Cannon accused Fleetwood of urinating on the bathroom floor and toilet seat and ordered him to clean it up. (*Id.* at Ex. 12, Fleetwood Dep. at 58–59; *Id.* at Ex. 13, Cannon Dep. 105–06.) Cannon did so even though Fleetwood denied it. (*Id.*) On another occasion, Cannon felt Fleetwood was moving a cage too slowly and allegedly "jumped on [his] case and said you think you deserve a raise." (*Id.* at Ex. 12, Fleetwood Dep. at 121.) Fleetwood maintains that a fellow employee, Nick Sou, witnessed this interaction and thereafter remarked on Fleetwood's desire for a raise whenever Cannon

told Fleetwood to do something. (Pl.'s Mot. for S.J. at Ex. 23, Fleetwood Dep. at 153.)

Fleetwood also claims that when he asked Cannon if he could take home the address card that Cannon had distributed so he could get help filling it out, Cannon responded, "no, you fill it out right now because I know what your problem is." (*Id.* at 133; Pl.'s Resp. to Def.'s Interrogatories at 8(D).) In addition, at some point during his tenure, HSI instituted a system of placing employees' names on a board to assign overtime work. (Pl.'s Resp. to Def.'s Interrogatories at 8(F).) Cannon accused Fleetwood of not coming to work when his name was on the board, but Fleetwood insists he was never told to look for his name. (*Id.*) Later, Fleetwood alleges that he came to work early because he had seen his name on the board, only to discover his name had been erased. (*Id.* at 8(G).) Cannon maintains that Fleetwood's name was never there. (*Id.*)

Fleetwood further contends that when he was using a pallet jack on one occasion, Cannon shouted at him that he should not use the jack for that job, even though Fleetwood knew other employees used it for that purpose. (*Id.* at Ex. 23, Fleetwood Dep. at 47–48, 53.) Cannon also allegedly told Fleetwood on a different occasion not to leave a pallet jack in front of Cannon's desk, even though another employee had told him to leave it there. (*Id.* at 46–47.) On another day, Cannon told Fleetwood to sweep the floor with another employee. Fleetwood claims that Cannon then yelled at him for sweeping too much and ordered him back to his workstation. (Pl.'s Resp. to Def.'s Interrogatories at 8(J).)

Finally, Fleetwood testified that Cannon referred to the EEOC complaint Fleetwood filed, stating that he, Cannon, would not be fired and that if anyone would be

leaving HSI it would be Fleetwood.[2] (*Id.* at 8(E)).) Overall, Fleetwood testified that Cannon made him feel like he "was less than a person, didn't deserve to keep the job and that [he] wasn't able to keep a job." (*Id.* at 177.) Fleetwood stated that he felt stressed because he feared losing his job. (*Id.*)

Fleetwood left HSI approximately 10 months after he was hired, after suffering an injury in a non-work-related accident on September 16, 1999. (Def.'s Mot. for S.J. at Ex. 12, Fleetwood Dep. at 171.) He received disability benefits under HSI's short-term and long-term disability programs. (*Id.* at 172.) Fleetwood filed this suit in July 2003 alleging several claims under the ADA. It appears the only claims Fleetwood wishes to pursue at this point are: (1) failure to reasonably accommodate his disability; (2) failure to give him a pay raise because of his disability and/or his need for a reasonable accommodation; (3) hostile work environment; and (4) intimidating and/or threatening harassment.[3] HSI filed a motion for summary judgment in April 2004, and Fleetwood filed a cross-motion seeking partial summary judgment on his first two claims, and opposing summary judgment for HSI on his last two claims.

## II.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir.2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.1993), and citing

---

2. Though there is no evidence in the record of it beyond the interrogatory, Fleetwood apparently filed an EEOC charge prior to his departure from HSI in 1999.

3. In his complaint, Fleetwood also alleged a failure to give him benefits to which he was entitled, but he appears to have dropped this claim, as he does not discuss it in any of his papers. Additionally, the intimidating and threatening harassment claim was not specifically alleged in the complaint, but was argued in his motion for summary judgment. This claim will be addressed in Part VI, *infra.*

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## III.

 Fleetwood's first claim is that HSI discriminated against him by failing to reasonably accommodate his disability. Under the ADA, discrimination includes not making reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the business. 42 U.S.C. § 12112(b)(5)(A). A "qualified individual with a disability" is a person with a disability within the meaning of the statute who, with or without reasonable accommodation, can perform the essential functions of the job in question. 42 U.S.C. § 12111(8). Thus, in order to establish a prima facie case of failure to accommodate, a plaintiff must show the following: (1) that he is an individual who has a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of his job; and (4) that the employer refused to make such accommodations. *Rhoads v. FDIC,* 257 F.3d 373, 387 n. 11 (4th Cir. 2001). Ultimately, Fleetwood bears the burden of establishing his ability to perform the essential functions of his job with a reasonable accommodation. *Tyndall v. National Educ. Centers, Inc. of California,* 31 F.3d 209, 213 (4th Cir.1994).

 The regulations implementing the ADA define a person with a disability as someone who either: (1) has a physical or mental impairment which substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *See* 29 C.F.R. § 1630.2(g). A person does not qualify as "disabled" simply by submitting evidence of a medical diagnosis of an impairment. *See Toyota Motor Mfg., Ken-tucky, Inc. v. Williams,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). Rather, an individual must offer evidence that the limitation caused by the impairment "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives," and that the impact of the impairment is permanent or long-term. *Id.*

The ADA regulations specifically include dyslexia, a learning disability, as an impairment. 29 C.F.R § 1630.2(h)(2). They also expressly mention learning in the non-exhaustive list of major life activities. 29 C.F.R. § 1630.2(i). Furthermore, courts have found that reading is a major life activity. *See, e.g., Gonzales v. Nat'l Bd. Of Med. Exam'rs,* 225 F.3d 620, 626 (6th Cir. 2000); *Bartlett v. New York State Bd. of Law Exam'rs,* 156 F.3d 321, 328 n. 3 (2d Cir.1998). Fleetwood has submitted the report of Dr. Jean–Fryer Schedler ("Schedler"), an educational consultant and reading specialist, who tested Fleetwood's abilities in December 2003 and found that he suffers from dyslexia, and that his dyslexia substantially limits his abilities in reading, writing, and learning compared to the average population. (Pl.'s Mot. for S.J. at Ex. 1, Schedler Evaluation Report at 7.) Specifically, Schedler found that Fleetwood's dyslexia caused him significant difficulty with visual memory (the immediate recall of all characteristics of a given form after four or five seconds), visual sequential memory (the immediate recall of a series of forms), and visual closure (the ability to identify forms that have just been viewed when those forms are reproduced in a slightly different way or not as precisely). *Id.* This meant that he would have trouble seeing numbers in one place and copying them in the correct order in another place. *Id.* He also would encounter difficulty if the numbers were not written precisely and did not look exactly as

they were supposed to look.[4] *Id.* Schedler's report appears to be reliable and credible evidence that Fleetwood's dyslexia is a disability.[5] Moreover, although HSI initially disputed that Fleetwood had a disability in its motion for summary judgment, it appears to concede in its brief in opposition to plaintiff's motion for summary judgment that Fleetwood has dyslexia and that dyslexia is a disability under the ADA. (Def.'s Opp'n to Pl.'s Mot. at 2.)

■ Even though Fleetwood has a disability, he can only state a claim under the ADA if he can demonstrate that he is a "qualified individual with a disability"— that is, that he can perform the essential functions of his job with or without reasonable accommodation. "Essential functions" are the fundamental job duties of the employment position that the person with the disability holds or desires. 29 C.F.R. § 1630.2(n)(1). It does not include the marginal functions of the position. *Id.* The parties dispute whether filling out timecards is an essential function of the beadblaster position. A job function may be considered essential for several reasons, including: (1) the position exists to perform that function; (2) there is a limited number of employees among whom the performance of the function can be distributed; and/or (3) the function is highly specialized such that the person who performs it was hired for his ability to perform it. 29 C.F.R. § 1630.2(n)(2). Evidence of whether a function is essential includes, but is not limited to: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing appli-

4. In order to reach these conclusions, Schedler ran a battery of tests used by professionals in the field, including the Test of Visual–Perceptual Skills (non-motor)—Revised, and the Woodcock–Johnson III Tests of Cognitive Abilities and Tests of Achievement, and found that Fleetwood's abilities in these areas were significantly lower than the abilities of the general population. (*See* Pl.'s Mot. for S.J. at Ex. 1, Schedler Evaluation Report at 7–8.) For example, Fleetwood, who was 43 years old at the time of the tests, performed worse in some areas than 99 percent of 13–year-olds who took the same tests. (*Id.* at 4–5.) Schedler also administered the Dolch List, which is used widely in schools because it lists those words that a person should be able to recognize by sight in order to read at different levels. (*Id.* at 6.) Of the 38 words necessary to achieve the kindergarten level of reading, Fleetwood was only able to read 13 words automatically, and seven words accurately but slowly. (*Id.*) He could not read the remaining 18 words, which included words such as "we," "is," "in," "and," "my," and "here." (*Id.*)

5. HSI argues that Fleetwood has not demonstrated that his dyslexia caused his problems with the timecards. (Def.'s Opp'n to Pl.'s Mot. at 2.) It attempts to bolster this argument by questioning the relevance of Schedler's report, claiming that she did not test the skills actually used by Fleetwood in filling out a timecard. *Id.* at 2–3. However, Schedler appears to have understood what was involved in filling out timecards. She knew Fleetwood had trouble writing and sequencing the numbers of job orders on his timecards, as well as difficulty recording the time he worked on each project. (Pl.'s Reply to Def.'s Opp'n at Ex. 29, Schedler Dep., at 139–140.) Thus, she tested his underlying ability to recognize and sequence forms and found that he had significant trouble with visual memory, visual sequential memory, and visual closure, as explained *supra*. *Id.* These problems prevented him from being able to copy a series of numbers accurately from one piece of paper to another. Schedler specifically stated that these difficulties would occur regardless of whether the numbers he was copying were far away from the timecard or right next to it, though she acknowledged the far point numbers would be more of a problem. (*Id.*, at 150.) While Schedler only tested Fleetwood's auditory recall of numbers, she tested his visual memory of forms because she felt his underlying limitations regarding the recognition and memory of forms was the basis for his problems with numbers. Aside from its bald assertions, HSI presented no evidence that Schedler's methodology is flawed or that her results are inaccurate.

cants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the person to perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past holders of the job in question; and (7) the current experience of holders of similar jobs. 29 C.F.R. § 1630.2(n)(3).

HSI contends that filling out timecards is an essential function of the beadblaster position held by Fleetwood. Cannon testified that all production employees used timecards to track their work, and that the timecards were used by the accounting department to make sure that HSI's customers were billed properly for each project. He also explained that because Fleetwood worked in a room by himself, he was the only one who knew how much time he spent on each beadblasting job he did during the day. To counter this evidence, Fleetwood points only to the written job description of the beadblast specialist position held by him. The description lists fourteen duties as "essential duties," none of which is the filling out of timecards. (Pl.'s Mot. for S.J. at Ex. 4, Job Description.) Moreover, reading, writing, and performing simple math are listed merely as "general requirements," not as essential duties. (*Id.*) Fleetwood argues that this job description is enough to create a genuine issue of fact as to whether filling out timecards is an essential function. He further claims that even if it is essential for HSI's employees to keep a daily production schedule and track their time on each project (*id.*), it is not essential that they do it by filling out timecards.

■ Although the issue of whether a function is essential requires the weighing of evidence and is generally a question for the jury, it can be decided on summary judgment if no reasonable jury could find that a certain function is or is not essen-

tial. In this case, Fleetwood does not refute the importance of the timecards. The only evidence he presents is the job description. The job description, however, is only one piece of evidence and is not dispositive. 29 C.F.R. pt. 1630, app. § 1630.2(n). By arguing that another method could be used to track time, Fleetwood is questioning HSI's business judgment, which is not the purpose of the essential function inquiry. Clearly certain functions could be performed in a different manner—that is the essence of a reasonable accommodation. The question is whether the function, however it is currently performed, is fundamental to the particular job. In this case, weighing all the evidence, a reasonable jury could not find that filling in timecards is not essential. The fact that no one else could know the information required to fill out Fleetwood's timecard, and the consequences of the failure to do so for HSI's billing purposes and customer relations, demonstrate that this duty is fundamental to the beadblaster position.

■ The final step in determining if Fleetwood is a "qualified individual with a disability" is deciding whether he could perform his essential functions with or without reasonable accommodation. "Reasonable accommodations" are "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). In order to be reasonable, the accommodation must be effective (i.e., it must address the job-related difficulties presented by the employee's disability), and it must allow the employee to attain an "equal" level of achievement, opportunity, and participation that a nondisabled individual in the same position would be able to achieve. *Bryant v. Better*

*Bus. Bureau of Greater Maryland, Inc.,* 923 F.Supp. 720, 736 (D.Md.1996).

Fleetwood relies on Schedler's report to identify two possible accommodations that would have allowed him to fill out the timecards. The first was to have a co-worker help Fleetwood fill out his timecards. (Pl.'s Mot. for S.J. at Ex. 1, Schedler Evaluation Report at 8.) The second was to allow Fleetwood to use a system involving a magnetic dry erase board and magnetic numbers.[6] *Id.* As to the first of the accommodations, permanent help from a colleague, courts frequently have held that an accommodation requiring the elimination of an essential function is not reasonable. *See, e.g., Hill v. Harper,* 6 F.Supp.2d 540, 544 (E.D.Va.1998). Even if Fleetwood only sought assistance and supervision while he wrote the information on his timecards himself, it would involve permanent help with an essential duty, which also has been considered an unreasonable accommodation.[7] *See EEOC v. Dollar General Corp.,* 252 F.Supp.2d 277, 291–292 (M.D.N.C.2003)(permanent job help cannot be a reasonable accommoda-tion); *Ricks v. Xerox Corp.,* 877 F.Supp. 1468, 1477 (D.Kan.1995)(requiring employer to hire helper to assist in doing essential job functions would not be a reasonable accommodation).

Cannon concedes in his deposition, however, that he would have accommodated Fleetwood by giving him permanent help from others if he was diagnosed with dyslexia,[8] (see Pl.'s Reply to Def.'s Opp'n at Ex. 30, Cannon Dep. at 89–90,) and HSI did not argue that permanent help was an unreasonable accommodation. Thus, for purposes of this motion, the court finds that permanent help from a fellow employee would be a reasonable accommodation.

The alternative accommodation, a dry erase board with magnetic numbers, was not proposed to HSI while Fleetwood was employed there, but only later as part of the litigation process. HSI never had the opportunity to consider whether this accommodation would be reasonable. Therefore, the court will not address at this time the reasonableness of the dry erase board as an accommodation for Fleetwood.[9]

**6.** The board would have an exact replica of the timecards' grid drawn into it, and several sets of magnetic numbers would be available. (Pl.'s Mot. for S.J. at Ex. 1, Schedler Evaluation Report at 8.) Fleetwood would use the numbers to fill in the grid with the time and the job number for each project. *Id.* Then he would lay the actual timecard next to the magnetic board and copy from the board to the card. *Id.* This system would essentially provide Fleetwood with an extra step that would ensure accuracy when he filled in the actual timecard. *Id.* He could reorganize the magnetic numbers as many times as he needed if he made mistakes sequencing them, and then he could double check his written timecard against the board. *Id.*

**7.** Fleetwood was expected to work in a small room by himself; as pointed out earlier, only he would know what time he had spent on each part.

**8.** Cannon originally had assigned other employees to temporarily assist Fleetwood in or-der to enable him to fill out the timecards on his own. Though Cannon agreed that he could accommodate Fleetwood permanently in this fashion, elsewhere in his deposition he indicated that this arrangement would be unreasonable, stating that the other employees "can't follow him all day long and be tracking what he's doing. They can't get their work done." (Def.'s Opp'n to Pl.'s Mot. at Ex. 16, Cannon Dep. at 166). *See Gilbert v. Frank,* 949 F.2d 637, 644 (2nd Cir.1991)(requiring assistance from coworker would "slow down and reduce the productivity of the operation.").

**9.** The court will note, however, that even Schedler admitted that Fleetwood might not be able to check his own work using this system. She stated that "he may need to have a coworker come in and double-check his work, and if he still isn't able to get it right, then he may need to have a coworker simply do it for him." (Pl.'s Reply to Def.'s

■ Because Fleetwood has established that he could do the essential functions of his job with reasonable accommodation, he must next prove that his employer had notice of his disability. *See Rhoads,* 257 F.3d at 387 n. 11. It is disputed whether Fleetwood told Cannon that he had dyslexia during his job interview and whether he told Peloquin that he had dyslexia during his first day orientation. However, the parties agree that Cannon learned about Fleetwood's disability during their meeting regarding his 90–day performance evaluation and Peloquin learned about it shortly thereafter. Because the allegations regarding the failure to reasonably accommodate only includes events following the 90–day review, the dispute about whether HSI was on notice at any point prior to that day is irrelevant for purposes of this motion and, accordingly, Fleetwood has proven this third element of the prima facie case as well.

■ The final element Fleetwood must demonstrate for his prima facie failure to accommodate claim is that HSI refused to make any reasonable accommodations for his disability. The employee bears the initial burden of informing his employer that an accommodation is needed. *Bryant,* 923 F.Supp. at 737. Once the employee does this, if it is not immediately obvious what accommodation would be appropriate, the ADA requires that the employer and employee engage in an interactive process to identify a reasonable accommodation. *Id.*; 29 C.F.R. § 1630.2(*o*)(3). The EEOC suggests that the employer should take the following steps to accomplish this goal: (1) analyze the particular job involved and determine its purpose and essential functions; (2) consult with the employee to ascertain the precise job-related limitations imposed by the disability and how they could be overcome; (3) in consultation with the employ-

ee, identify potential accommodations and assess the effectiveness of each in enabling the employee to perform his functions; and (4) consider the preference of the employee and implement the accommodation that is most appropriate for both the employee and employer. *Bryant,* 923 F.Supp. at 737.

■ Responsibility for identifying an accommodation, however, is shared between the employer and employee. *See May v. Roadway Express, Inc.,* 221 F.Supp.2d 623, 627–28 (D.Md.2002). A party that obstructs or delays the interactive process, or simply fails to communicate, is not acting in good faith to find a solution. *See Bultemeyer v. Fort Wayne Cmty. Sch.,* 100 F.3d 1281, 1285 (7th Cir. 1996). Nevertheless, an employer cannot escape liability simply because the employee does not suggest a particular reasonable accommodation that would assist him. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 317 (3d Cir.1999). The employer must work with the employee to determine what accommodation would help. Similarly, an employee cannot prevail simply by demonstrating that his employer failed to engage in the interactive process; he also must show that this failure to engage in the process resulted in the failure to find an appropriate accommodation. *See Scott v. Montgomery County Gov't,* 164 F.Supp.2d 502, 508 (D.Md.2001).

■ Once HSI had notice of Fleetwood's need for an accommodation, when he told Cannon and Peloquin that he had dyslexia and that it was interfering with his ability to fill out his timecards, both parties were obligated to communicate as to what specific accommodation was necessary. "The interactive process, as its name implies, requires the employer to take some initiative." *Taylor,* 184 F.3d at

Opp'n at Ex. 1, Schedler Evaluation Report at 149.)

315. On the other hand, when only one party has information as to the employment-related disability, as only Fleetwood knew the tutoring was ineffectual, failure to provide that information may be viewed as obstructing the interactive process. *See Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir.1996). The record highlights deficiencies in communication on both sides of this dispute. As mentioned, Fleetwood never informed HSI that his tutoring sessions were not assisting him with his timecard difficulties; nor did he provide HSI evidence that he had been evaluated and was diagnosed as dyslexic. Similarly, HSI never made any efforts to determine if Whittman's one-hour weekly tutoring sessions were helping Fleetwood with his problems at work. HSI also never asked for more information about dyslexia and how it affected Fleetwood's job performance. Thus, it seems as of the time Fleetwood was injured and became unable to work, the interactive process may not have been completed. Because there is a genuine dispute about whether both parties met their respective burdens of engaging in the interactive process in good faith, and whether that caused a failure to accommodate, both parties'

motions for summary judgment on this claim will be denied.

### IV.

█ Fleetwood's second claim is that HSI discriminated against him by refusing to give him a pay raise because of his disability and/or his need for a reasonable accommodation. Under the ADA, it is unlawful for an employer to discriminate on the basis of disability with respect to an employee's rate of pay or any other form of compensation and changes in compensation. 29 C.F.R. § 1630.4(c). Discrimination can take many forms, and in this claim Fleetwood appears to be arguing that the denial of the pay raise was an exclusion of an employment opportunity "because of [his] disability," 42 U.S.C. § 12112(b)(1), and/or that it was the denial of an employment opportunity "based on the need of [HSI] to make reasonable accommodation" to Fleetwood's dyslexia. 42 U.S.C. § 12112(b)(5)(B). Specifically, he argues that because HSI expressly denied the pay raise because he was unable to fill out his timecards on his own, and placed his evaluation on hold until he completed a reading program, this means he was denied the raise because of his need for an accommodation, which was occasioned by his disability.[10]

---

10. Fleetwood argues in his opening motion (but not in his reply) that there is a material issue of fact as to whether HSI's raise policy was implemented consistently among all employees. He claims he was the only beadblast employee who did not receive a pay raise, and that other employees who did get raises did not receive satisfactory ratings in all the categories of their performance evaluation. This argument suggests that while the reason given for the denial of the raise was Fleetwood's performance, the actual reason was discrimination because of his disability. Fleetwood's argument fails, however, because he has not produced sufficient evidence to create a genuine issue of material fact.

He points to two pay raises received by an employee named Alton Scott. The first of these raises, however, was based on an agreement at the time of Scott's hire that if HSI

kept him as an employee after the 90–day period expired, he would definitely receive a raise. (Pl.'s Mot. for S.J. at Ex. 17, Scott Personnel Transaction.) Fleetwood's raise at the expiration of the probationary period was not guaranteed, but simply a possibility. Scott's second raise was given eight months after his hire, in January 1999, despite the fact that he did not receive satisfactory ratings in all eight categories. HSI claims, however, and Fleetwood does not dispute, that this was an annual raise and that Cannon's requirements for such a raise were not the same as the requirements for the 90–day raise. The other employee Fleetwood mentions is Richard Ashton. Ashton received a pay raise in 2002 despite receiving a below satisfactory rating in one category. (*Id.* at Ex. 19, Ashton Performance Evaluation.) However, not only does this appear to have been

 HSI's decision, however, was not based on the fact that Fleetwood had a disability, but that he was unable to perform an essential function of his job. An employer may make a decision that adversely affects an employee based on the fact that the employee cannot perform the essential functions of his job, even if the cause of the employee's inability to do his job is his disability. *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1196 (7th Cir.1997).[11] Of course, in these circumstances, once the employer learns of the disability, he has an obligation to provide a reasonable accommodation that would allow the employee to perform his job, as described *supra,* so long as the accommodation would not unduly burden the employer. However, where there is no reasonable accommodation that can be implemented immediately, it would be unreasonable to require an employer to give an employee who has not been performing well a benefit, such as a raise, in the hope that once a reasonable accommodation is determined the employee will perform well enough to deserve that benefit.

In this case, HSI was not required to give Fleetwood a pay raise. Whether or not satisfactory performance of all his duties was necessary to earn the raise, the parties agree that he was told at the time of his hire that he would merely be eligible for a raise after 90 days. Fleetwood was not filling out his timecards properly, and therefore did not qualify for the raise. It happens that the reason he was unable to fill out his timecards was his disability, and HSI had an obligation to reasonably accommodate that disability. But until HSI saw that Fleetwood was able to perform that function with a reasonable accommodation, it was not required to give him a raise.

Fleetwood's argument that the denial of the pay raise was based on the need for a reasonable accommodation is similarly flawed. He claims that because HSI specifically deferred the decision to give him a raise until his completion of the reading program, it denied him the raise based on his need for a reasonable accommodation. An employer may not allow an individual's need for an accommodation to enter his decision regarding hiring, discharge, promotion, or other similar employment decisions unless the accommodation would impose an undue hardship on the employer. 29 C.F.R. pt. 1630, app. § 1630.9(b). Thus, this portion of the ADA is aimed at preventing employers from avoiding the extra work or trouble that might be necessary to reasonably accommodate disabled employees by simply not giving these employees the opportunities that would require the accommodations.

In this case, it is undisputed that HSI chose to defer its decision on Fleetwood's raise until he completed his reading program. In doing so, HSI was attempting to accommodate Fleetwood by referring him to see whether he could improve his performance on the timecards and thus be eligible for a pay raise. Again, denial of the raise was based on Fleetwood's inability to perform an essential function of the job rather than his need for an accommodation.

---

an annual raise as well, but it was implemented by someone other than Cannon, who was no longer the supervisor of beadblasters at that time. *Id.* HSI contends, and Fleetwood does not dispute, that the person who gave Ashton his raise may not have required satisfactory ratings in all categories to qualify for the raise.

**11.** The analysis of this claim requires a finding that filling out timecards was an essential function because, as the holding in *Matthews* implies, it would not be reasonable for an employer to deny an employment opportunity to a disabled employee who could not perform only a marginal function of his position.

## V.

■■■■ Fleetwood also claims that HSI subjected him to a hostile work environment in violation of the ADA. Unlike the first two claims, Fleetwood does not argue that he is entitled to summary judgment on this claim, but only that HSI is not entitled to it. A plaintiff must prove the following to establish a hostile work environment claim: (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer. *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir.2001). The plaintiff must demonstrate not only that he subjectively perceived the workplace environment as hostile, but that it was objectively hostile as well—i.e., that a reasonable person would perceive it as such. *Id.* at 178. Fleetwood's evidence that HSI subjected him to a hostile work environment is detailed in Part I, *supra*.

The court will assume that Fleetwood satisfies the first two parts of the five-part test. Whether the third element of the test has been proven is not clear; none of the incidents described in Part I involved statements specifically about Fleetwood's disability, or slurs or epithets describing him. Nevertheless, some courts have found that criticisms suggesting that disabled employees are slow workers, lazy, or overstate their disabilities may be considered harassment based on a disability, because a jury could infer that the employer was engaging in negative stereotyping of the employee. *See Haysman v. Food Lion, Inc.*, 893 F.Supp. 1092, 1108–09 (S.D.Ga.1995). Under this logic, some of

Cannon's conduct could be considered harassment based on Fleetwood's disability. Specifically, his yelling at Fleetwood for moving too slowly and the address card incident in which he implied that Fleetwood was overstating his difficulties both raise inferences of negative stereotyping.[12]

■■■■ Finally, however, the fourth element Fleetwood must prove is that the harassment was sufficiently severe or pervasive to alter a term or condition of employment. Factors to consider in determining whether harassment is severe or pervasive are: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Fox*, 247 F.3d at 178. Given that there are only two or three incidents that could be considered disability-based harassment, that the incidents were offensive but not physically threatening or humiliating, and that they were not specifically targeted at Fleetwood's disability, no reasonable jury could find that the harassment was severe or pervasive. *See, e.g., Cannice v. Norwest Bank of Iowa N.A.*, 189 F.3d 723, 726 (8th Cir.1999) (harassment not severe or pervasive where only two incidents could colorably be connected to plaintiff's mental condition); *Wallin v. Minnesota Dep't of Corr.*, 153 F.3d 681, 688 (8th Cir.1998) (while employee cited numerous incidents of friction in workplace, harassment was not severe or pervasive because only three were related to his disabilities). Hostile work environment claims may not be based on isolated incidents, nor is a general pattern of mere insensitivity sufficient. *See Cannice*, 189 F.3d at 726; *May v. Roadway Express, Inc.*, 221 F.Supp.2d at 629. Accordingly, summary judgment will

---

**12.** Cannon's accusation that Fleetwood did not come into work when his name was written on the overtime board could possibly be seen as an inference of laziness as well.

be granted in favor of HSI on this claim as well.

## VI.

In his brief for summary judgment and opposition to HSI's motion for summary judgment, Fleetwood claims that a material issue of fact remains as to whether he was subjected to intimidating and/or threatening harassment in violation of 42 U.S.C. § 12203(b). He argues that this claim also should survive HSI's motion for summary judgment. HSI correctly points out, however, that Fleetwood did not allege any facts in his complaint about intimidating or threatening harassment by HSI. It would be unfairly prejudicial to HSI to permit the addition of a new claim after discovery has concluded and at the end of dispositive motions briefing.

For all the reasons stated above, HSI's motion for summary judgment will be granted except as to the failure to accommodate claim, and Fleetwood's motion for partial summary judgment will be denied.

A separate Order follows.

### (REVISED) *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. the plaintiff's motion for partial summary judgment (docket entry no. 23) is **DENIED;**

2. the defendant's motion for summary judgment (docket entry no. 22) is **GRANTED** in part and **DENIED** in part;

3. copies of this Order and the accompanying Memorandum shall be sent to counsel of record; and

4. counsel will be contacted to schedule further proceedings in this case.