MICHAEL, Circuit Judge,
dissenting in part and concurring in part.
I respectfully dissent from the majority’s decision in part II.B to affirm summary judgment for Wyeth, Inc. on Ronald Mason’s hostile work environment claim under the Americans with Disabilities Act (ADA). The majority erroneously concludes that Mason’s claim fails because Wyeth’s manager Wayne Samford did not harass Mason because of his deafness. When the facts are taken, as they must be, in the light most favorable to Mason, they reveal that Samford relentlessly took advantage of Mason’s deafness in playing pranks on him to provoke his extreme “startle reaction.” Far from being mere horseplay, these incessant pranks ultimately led to a deterioration in Mason’s mental health and made his work environment a hostile one.
I.
In 1989 Ronald Mason began working as an offset printer operator in the print services department of A.H. Robins Company, Inc., a Richmond, Virginia, concern that later became part of Wyeth. Samford and Otis Martin were Mason’s supervisors during most of Mason’s employment, including the period relevant to this case. Mason, who is deaf, was a highly skilled employee. He did not usually wear hearing aids at work because using them in the noisy work environment caused dizziness and headaches.
Although Mason’s coworkers liked him and treated him like a “normal hearing person” in many ways, they were generally *365 clueless about and indifferent to his disability. J.A. 42. As Mason put it, “They don’t understand about my hearing disability.” Id. Mason’s managers likewise were indifferent to his deafness. For example, Mason requested a sign language interpreter early in his employment so that he could follow the discussion and participate in group meetings, but Samford and Martin never provided one. Mason explained to Samford and Martin that he “[could not] understand a word” at the meetings. J.A. 92. Mason specifically said to them, “I need [an] interpreter,” and asked, “Can someone see ... about getting an interpreter?” J.A. 92, 94. Samford and Martin just responded, “Turn your hearing aid up. Get up in front.” J.A. 92. As a result of this indifference, Mason did not have access to the same workplace information that his hearing coworkers did. Whenever Mason wore his hearing aids at work, Samford would expect Mason to function at all times as “a hearing person,” but Mason obviously could not. J.A. 44. For instance, even when wearing his hearing aids, Mason could not understand voices on the telephone because his hearing aids distorted the sound. Disregarding this problem, Samford criticized Mason for not taking phone messages correctly. At times Mason’s coworkers would speak to Mason in a belittling way about his disability, saying, ‘You hear what you want to hear.” J.A. 42. This accusation, Mason insisted, was not true. In addition, one coworker, Ray Slaughter, mocked Mason’s impaired speech.
In 1998 or 1999 Samford began playing pranks on Mason that were both cruelhearted and discriminatory because they exploited Mason’s deafness. As often as two or three times a week, Samford would sneak up behind and pinch Mason while making a hissing noise or blowing air from an air hose onto Mason’s hand. As Mason described the incidents:
I hear the sound, psst, and he touch me like a snakebite, yes, but I didn’t hear him approach me, behind me. I can’t hear him____ My job is focus on work. If I hear, I will turn around. I would prevent it. The advantage is I can’t hear him, and it’s so easy for him — I was so target, easy to be attacked, because I jump. I jump my legs. And he laughed, think it’s funny, because I overreacted.
J.A. 49-50. In addition, Samford would often hide a rubber rat in the work area to shock Mason. Mason estimates that Sam-ford scared him with the rat at least twenty-five times in one year. Samford used the rat on occasion to scare other print shop employees, but Mason was his most frequent prey.
Although Samford played pranks on other employees, Mason was Samford’s “number one target” because Mason’s disability made it easy for Samford to sneak up behind him and provoke a severe startle reaction. J.A. 55. Mason explained, “[M]y nerve is very jumpy. And anybody touch me, I jump ... because the deaf people, if you tap behind deaf people, what happen? It causes deaf people to startle. Deaf people prefer people come around in front where they can see, see you. I’m the same way.” J.A. 68-69. Samford tormented Mason because he (Samford) was amused by Mason’s reactions; Samford admits they made him laugh. Mason’s reactions also made Mason’s coworkers laugh. According to Mason, Samford was motivated to scare Mason primarily because of Mason’s startle reactions.
[A]s being a hearing-impaired person, other than normal hearing person, you can hear him coming, and you don’t usually scare as much as they are. When you’re impaired person, it’s like I’m almost deaf and I’m working on *366 machine and it’s just — all my mind is staying on machine. When unexpected startle or — I mean, I’m telling you, it scared the shit out of me, because there’s a lot to do with hearing disability. It just made me — heart pounding, scaring. My face turned white, and I jump. Nobody jumps like I do. It scares me to shit. And Wayne [Sam-ford] likes that, my action of being scared. He thinks it’s funny.... [H]e kept on and on and on and on and on, never stopped.
J.A. 67-68.
Mason’s coworkers confirmed that Sam-ford targeted Mason with harassing conduct because of his disability. Mason’s coworker Judith Kounnas reported that Mason was an easier target for pranks than other employees because he could not hear. Mason’s coworkers also confirmed that print shop employees did not reciprocate with pranks on Samford. See, e.g., J.A. at 251 (coworker Roger Jones stating, “You don’t usually play tricks on the boss.”).
“[M]ore than once, maybe several times,” Mason pleaded with Samford to stop his “shit,” explaining to Samford that his pranks were “getting on [Mason’s] nerves.” J.A. 50. Read in context, Mason’s statement about his frayed nerves conveys more than mere annoyance: Sam-ford’s pranks were affecting Mason’s nervous condition. (Samford was aware of Mason’s condition and knew that Mason took medication to “calm [his] nerves.” J.A. 69.) Samford ignored Mason’s requests, however, forcing Mason to seek help from another person in management, Otis Martin. Mason reported Samford’s harassment to Martin two times. He specifically asked Martin if he “would ... tell [Sam-ford] to stop.” J.A. 47. Martin seemed to feel sorry for Mason; he told Mason that he knew Samford’s conduct was wrong and that he would “see what he [could] do.” J.A. 79-80. But nothing was done, and Samford’s harassment persisted.
Samford’s pranks caused Mason to suffer great anxiety and physical distress. Although Mason took additional medication to alleviate his anxiety, his job performance began to suffer. Mason would often lose his concentration and have trouble focusing and handling his tools. His work slowed. The harassment even caused Mason to incur minor physical injury at work. On occasion Samford’s conduct would cause Mason to lose his balance and skin his knuckles. Once Mason fell over and hurt his back.
In late 2002 Mason’s anxiety became so severe that he began to contemplate suicide. He was referred to a psychologist, Dr. Nancy MacConnachie, who diagnosed him with post-traumatic stress disorder. In January 2003 Dr. MacConnachie wrote a letter to Shirley Hess in Wyeth’s Human Resources Department. Dr. MacConnachie cited Samford’s conduct as a source of Mason’s emotional deterioration and emphasized that it was necessary to put an immediate stop to the “apparently discriminatory behavior in [Mason’s] work place.” J.A. 10. Hess responded about three weeks later by holding separate meetings with Mason, Martin, and Samford about the harassing conduct. At the meeting with Mason, held on February 13, 2003, Mason cried and explained why he was scared and depressed as a result of the pranks. Sam-ford and Martin confirmed that the incidents had occurred.
II.
To establish a hostile work environment claim under the ADA, Mason must establish that (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on (or because of) his disability; (4) *367 the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability to the employer. Fox v. General Motors Corp., 247 F.3d 169, 177 (4th Cir.2001). The majority errs in concluding that Mason does not proffer sufficient facts to establish the third element, that he was harassed because of his disability.
A
The majority contends that Mason was not harassed on account of his disability because Samford was not the only person in the print department who played pranks and because Samford played many of the same pranks on Mason’s non-disabled coworkers. This contention suffers from two fatal flaws. First, Mason has produced sufficient evidence to allow a reasonable jury to conclude that he was the primary target of Samford’s harassment. Mason testified that he was subjected to pranks more frequently than others in the department. Mason also testified that we was the “number one target” for Samford’s pranks because he was easy to sneak up on and because his startle reaction was extreme. Mason’s coworker, Judith Kounnas, corroborated this account. Even Samford’s testimony, taken as a whole, would allow a jury to infer that he targeted Mason: Samford surprised Mason with his pranks more often than any other employee because he found Mason’s extreme startle reaction amusing. Moreover, the type of pranks Samford played specifically exploited Mason’s inability to hear and his exaggerated startle reaction. It is true, as the majority notes, that some of Mason’s coworkers testified that Samford did not target Mason more frequently than other employees. This testimony simply reveals the presence of a genuine issue of material fact as to whether Mason was the primary target of Samford’s harassment; it does not defeat in summary judgment proceedings Mason’s evidence that he was the number one target.
I recognize that some of Mason’s deposition testimony, when read out of context, may appear to undermine his claim. For instance, he testified that he knew Sam-ford targeted other employees with pranks, that he understood Samford’s actions to be a “joke,” and that his coworkers treated him as a “normal hearing person.” J.A. 42, 50. Again, these statements are not fatal on summary judgement, where all reasonable inferences must be drawn in Mason’s favor. See Laber v. Harvey, 438 F.3d 404, 415 (4th Cir.2006) (en banc). To illustrate, Mason’s statement that Sam-ford’s pranks were a “joke,” when read in context, can be understood to mean that he did not realize at the time that Samford’s pranks were unlawful. See J.A. 50 (Mason testifying that “no one told [him] it was wrong,” and explaining that he went to Martin for “help” in trying to get Samford to stop his pranks). Likewise, Mason’s statement that his coworkers treated him as a “normal hearing person,” when read in the context of Samford’s failure to provide a sign language interpreter and other employees’ accusations that Mason “hear[s] what [he] want[s] to hear,” show insensitivity to his disability. These statements therefore do not negate Mason’s argument that Samford’s conduct was subjectively and objectively offensive.
The majority, in concluding that Mason was not harassed because of his disability, relies on evidence that Samford also played pranks on Mason’s non-disabled coworkers. A disabled employee, however, can be abused in ways that cannot be explained without reference to his disability, notwithstanding that non-disabled employees are exposed to the same treatment. Cf. Ocheltree v. Scollon Prods., *368 Inc., 335 F.3d 325, 332 (4th Cir.2003) (en banc). Thus, even though other employees took offense at Samford’s pranks, a jury could reasonably find that Samford engaged in this conduct largely because he “enjoyed watching and laughing at the reactions of the only [deaf person] in the [workplace].” Id. Tellingly, most if not all of Samford’s pranks specifically exploited Mason’s inability to hear. Evidence that Mason’s coworkers mocked his impaired speech and that his supervisors ignored his requests for disability accommodations demonstrates general workplace hostility to the presence of a person with a disability. This general hostility supports Mason’s claim that he was harassed because of his deafness.
The majority attempts to paint Sam-ford’s conduct toward Mason as mere “prank-playing shenanigans” that permeated the work environment and that Mason himself even instigated at times. Ante-. To this end, the majority emphasizes the few, isolated jokes Mason played with his coworkers over his fourteen-year tenure with Wyeth. On one occasion, Mason placed a fake snake on Roger Jones’s lunch bag. On another occasion, Mason placed a dead bug on top of a candy bar on Jones’s desk. (Jones liked the bug because it kept people from stealing his candy, and so he left it on his desk for years.) Mason also once tried to unlock the bathroom door when Jones was using the bathroom, a joke that Jones reciprocated the next day. Finally, Mason testified that once, outside of work, he “mooned” traffic on 1-95, although he did not drop his undershorts. Mason’s isolated pranks differ from Samford’s persistent, abusive conduct in many ways. Most important, when Jones asked Mason not to scare him with the fake snake anymore, Mason stopped. Mason was thus willing to modify his conduct in response to his coworker’s request. In contrast, Samford persisted with his harassment even though Mason repeatedly complained to Samford and Martin about Samford’s conduct. Mason’s pranks also differed from Samford’s because Mason did not specifically exploit his coworkers’ physical disabilities. Additionally, Mason’s pranks were reciprocal. Mason played a few jokes on Jones (whom he did not supervise), and in return Jones played a few jokes on him. In contrast, most print shop employees testified that no one played jokes on the boss, Samford. As Jones explained, “You don’t usually play tricks on the boss.... I don’t know how [Samford] would take it.” J.A. 251. The majority simply fails to make the case that Mason’s conduct can be equated with Samford’s.
In sum, the summary judgment record, viewed in the light most favorable to Mason, reveals that he was harassed because of his disability.
B.
The next issue is whether the district court erred in concluding that Samford’s conduct was not sufficiently severe or pervasive to constitute an objectively hostile or abusive work environment. The court did err. Factors relevant to whether the environment is objectively hostile include “the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” Fox, 247 F.3d at 178. Each of these factors weighs in favor of a determination that Samford’s conduct helped create an objectively hostile or abusive work environment. Mason’s account of his experience at work, supported by Dr. MacConnachie and his treating physician, shows that Samford’s harassing conduct was constant, physically invasive, humiliating, and emotionally harmful and *369 that it interfered with Mason’s job performance.
Mason described in clear detail the feelings of anxiety and panic that Samford’s pranks made him experience and how these reactions were specifically connected to his disability. He explained why it was especially frightening for him, as a deaf person, to be startled by a pinch or blast of air from a hose from someone he could not possibly hear approaching from behind. He also described how the anxiety caused him to make mistakes at work, incur minor injuries, and generally “slow[ ] ... down.” J.A. 90. Samford’s conduct could perhaps be characterized as horseplay if directed only at hearing employees, but it is plainly abusive and offensive when directed at someone who cannot hear. Samford’s insistence upon continuing the pranks despite Mason’s repeated requests that he stop (which included an explanation of how the pranks affected his nervous condition) makes Samford’s conduct even more abusive and offensive.
III.
There are genuine issues of material fact as to (1) whether Mason was harassed because of his disability and (2) whether Samford’s conduct was sufficiently severe or pervasive to constitute an objectively hostile work environment. Accordingly, I believe that Mason is entitled to a trial on his hostile work environment claim. Because I would reverse the district court’s grant of summary judgment to Wyeth on this claim, I dissent in part from the majority opinion. However, I concur in the majority’s determination that Wyeth is entitled to summary judgment on Mason’s reasonable accommodation, retaliation, and state tort claims.