**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1563

MICHAEL J. PEARLMAN,

Plaintiff - Appellant,

v.

PENNY PRITZKER, Secretary of U.S. Department of Commerce,

Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.   Peter J. Messitte, Senior District Judge.  (8:12-cv-03381-PJM)

Submitted: October 21, 2013          Decided:  April 3, 2014

Before DUNCAN and THACKER, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

Ellen K. Renaud, SWICK & SHAPIRO, P.C., Washington, D.C., for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Neil R. White, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Michael Pearlman sued Penny Pritzker, Secretary of the U.S. Department of Commerce, for violations of the Rehabilitation Act. 29 U.S.C. § 794(a). Pearlman alleged that his former employer, the National Oceanic and Atmospheric Administration (NOAA), discriminated against him on the basis of his deafness by terminating his employment in retaliation for his complaints about the inadequacy of NOAA's interpreter services. The district court granted summary judgment in favor of Pritzker, concluding that there was no genuine dispute of material fact that Pearlman was terminated for a legitimate, nondiscriminatory, and nonpretextual reason. Pearlman appeals the district court's judgment. For the reasons that follow, we affirm.

I.

Pearlman, a deaf man, was hired in June 2010 as a program analyst at NOAA. He requested the services of an interpreter during his tenure, which NOAA provided by virtue of a preexisting arrangement it had with an outside contractor. Pearlman found twelve of the fourteen interpreters substandard, placing them on his "do not call" or "black-list."

Pearlman's employment with NOAA was terminated in May 2011, one year after his start date. In the termination memorandum, Christine Carpino, the Deputy Director of the Workforce

2

Management Office, wrote that Pearlman's "performance and conduct" did not merit continued employment with NOAA. With respect to his performance, Carpino wrote that Pearlman had, at an April 2011 midyear review, taken credit for work that he had not done by claiming that he had "successfully implemented independently" 23 projects that Carpino knew "had been implemented and/or managed by others," including herself. J.A. 142-43 (emphasis added). Carpino instructed Pearlman to provide specifics on his work for the projects listed. He did so, but the additional information suggested to her that his work product did not warrant a promotion, and her consultation with other supervisors revealed that Pearlman "provided little tangible assistance" on the projects listed. J.A. 143.

Pearlman's conduct, however, was the core of Carpino's memorandum. She listed several incidents, starting in December 2010 and into May 2011, in which Pearlman had behaved in a manner "unacceptable and unbecoming a federal employee." J.A. 143. Carpino had received complaints about "the manner" in which Pearlman interacted with his coworkers: he was reported as "abrupt and demanding," "intimidating, disrespectful or personally offensive." He exhibited "outbursts of anger and frustration when co-workers disagreed" with him, wrote communications that were "inappropriately sarcastic and verging

3

on hostile in tone," and would send "angry, derogatory e-mails" that he was warned would damage his reputation. J.A. 141-42.

He had previously received a warning in December about his conduct and agreed to take several actions that would improve his working relationship with his coworkers. His behavior, however, continued and culminated in two more incidents. First, displeased with an interpreter, Pearlman – in front of other employees, one of whom reported that she thought Pearlman was "going to explode" - "got very loud, angry, and waved [his] hand frantically telling the interpreter to 'just go,'" J.A. 143. Second, he contacted the president of the contractor to complain that a tardy interpreter was "unacceptable" and the company president should "take corrective action to make sure this does not happen again," J.A. 143. In his e-mail, Pearlman took a hostile tone with the company president, writing that an interpreter in question was

> CLEARLY on my black list of interpreters THAT ARE NOT SUPPOSED TO BE ASSIGNED TO ME. DO YOU REALIZE THAT A NON QUALIFIED INTERPRETER WHO WOULD BE TRANSLATING WHAT I SAY TO SENIOR MANAGEMENT IN THE WRONG WAY COULD HURT ME DURING MY PERFORMANCE REVIEW AND ASKING FOR POTENTIAL PROMOTION? I am clearly not a happy camper at all about this. This was a stressful matter that I had to take care of this morning. I had to have [a representative] call [the interpreter service] and immediately change interpreter [sic] to someone else who was OK OK [sic] and didn't have enough time to review my materials before my meeting.

4

J.A. 134. A representative of the contractor had written Carpino to inform her that Pearlman was a "very exacting client" whose behavior had made the interpreters uncomfortable. J.A. 144. NOAA terminated Pearlman, and he initiated legal proceedings, contending that he was terminated for complaining about the inadequacy of the interpreter services, a reasonable accommodation to which he was entitled under law.

II.

Pearlman sued NOAA under the Rehabilitation Act, which provides that no qualified individual "shall, solely by reason of her or his disability, . . . be subjected to discrimination" in various federal programs. 29 U.S.C. § 794(a). The statute incorporates the standards of the Americans with Disabilities Act, id. § 794(d), which includes an anti-retaliation provision. 42 U.S.C. § 12203(a). Case law has transmuted these statutory prohibitions into the following analytical framework for assessing whether a plaintiff has properly made out a case for discrimination:

> On the one hand, an employee may utilize ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue. To avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact. What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.

5

On the other hand, under the burden-shifting method of proof, to establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action. The employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions. If the employer does so, the plaintiff must demonstrate that the proffered reason is a pre-text for forbidden retaliation. The plaintiff always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation.

Rhoads v. F.D.I.C., 257 F.3d 373, 391-92 (4th Cir. 2001) (citations and quotations omitted). Courts routinely use Title VII precedent when construing the Americans with Disabilities Act. Fox v. General Motors Corp., 247 F.3d 169, 176 (4th Cir. 2001).

Pearlman presented no direct or indirect evidence of discrimination, leaving the district court to resolve his case on the basis of the burden-shifting framework. The court ultimately concluded that Pearlman had made out a prima facie case of retaliation, but that there was a legitimate, nondiscriminatory, and nonpretextual reason for his termination: he was disruptive, rude, sarcastic, and a bully in the manner in which he complained about his desire for higher-caliber interpreters. We review the district court's summary judgment ruling de novo. Snider International Corp. v. Town of Forest Heights, Md., 739 F.3d 140, 145 (4th Cir. 2014).

6

We agree with the district court that there was a legitimate, nondiscriminatory, and nonpretextual reason for terminating Pearlman.

The material facts are not disputed: lodging complaints about the quality of interpreters could be a valid protected activity; viewed objectively, Pearlman's behavior was disrespectful and over-the-top; Pearlman's coworkers were offended by his behavior, and he does not dispute that such extreme conduct – insubordination, poor workplace demeanor, or angry outbursts - can constitute a legitimate and nondiscriminatory basis for taking an adverse employment action. Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999).

The issue raised by Pearlman is that NOAA's proffered reason for terminating him is not the actual reason he was terminated. He contends, in other words, that rather than firing him for his conduct, NOAA forced him to resign "in retaliation for complaining about inadequate sign-language interpreter services provided . . . as a reasonable accommodation for his disability." App. Br. 24-25. We disagree with this interpretation of the record, and for a simple reason: Pearlman has produced no evidence other than his own speculative assertions to raise an inference suggesting the falsity of the proffered nondiscriminatory bases for his termination.

7

Speculation is not enough. Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989).

Pearlman argues that a reasonable jury could find that Carpino was lying about some of the proffered reasons for terminating him. He asserts that at his performance review in April 2011, Carpino told him that he was "doing very well," but then abruptly changed her mind at a follow-up meeting two weeks later when she asked him to modify the description of his accomplishments to reflect that he had not, in fact, completed 23 projects "independently." J.A. 167. He asserts that this change is proof of her retaliatory motive. He is mistaken. The termination memorandum explains any ostensible inconsistency. Carpino consulted other supervisors, who reported on Pearlman's performance and corrected her initial view that he was a productive member of the workplace: "I also sought input from three other senior staff members regarding the assistance that you had provided to them on programs they managed. All of them replied that you had been in a learning mode and provided little tangible assistance." J.A. 143. Far from demonstrating the falsity of appellee's nondiscriminatory motive, the record harmonizes the supposed inconsistencies and paints a single picture of events that is not contradicted by any evidence.

Pearlman next asks that we infer a cover-up of the actual reason for his termination from his employer's "very late, and

false, explanation" for his termination: that he made a racially insensitive remark in the workplace, referring to the interpreter "black-list," that offended other coworkers. App. Br. 39. The racially insensitive remarks are – as the district court wisely observed - a red herring because racism was never the basis for Pearlman's termination as stated in the relevant memorandum. Thus, Pearlman cannot expose Carpino's "rationale as pretextual by focusing on minor discrepancies that do not cast doubt on [her] explanation's validity, or by raising points that are wholly irrelevant to it." Hux v. City of Newport News, Va., 451 F.3d 311, 315 (4th Cir. 2006).[*]

### III.

For the reasons stated above, the judgment of the district court is

AFFIRMED.

---

[*] For similar reasons, Pearlman's related contention, that a genuine dispute exists as to the actual content or tone of his complaints over the interpreters, lacks merit. See Kiel, 169 F.3d at 1136.